# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

## No. 99-20656
_____

JUSTIN LOVE; ET AL.,

                                    Plaintiffs,

BLUE CROSS AND BLUE SHIELD OF TEXAS, INC.,

                        Intervenor Plaintiff-Appellant,

versus

NATIONAL MEDICAL ENTERPRISES, ET AL.,

                                    Defendants,

NATIONAL MEDICAL ENTERPRISES, INC.;
NME PSYCHIATRIC HOSPITALS, INC., formerly
known as Psychiatric Institutes of America, Inc.;
NME SPECIALTY HOSPITALS, INC.; NORTH HOUSTON
HEALTH CARE CAMPUS, INC., doing business
as Laurelwood Hospital, formerly known as
Laurelwood Hospital, Inc.; BAYWOOD HOSPITAL,
INC., doing business as Baywood Hospital;
PSYCHIATRIC FACILITY AT AMARILLO, INC., doing
business as Cedar Creek Hospital, formerly
known as PIA Amarillo, Inc.; PIA DENTON, INC.,
doing business as Twin Lakes Hospital; PIA OF
FORT WORTH, INC., doing business as Psychiatric
Institutes of Fort Worth; PIA SAN ANTONIO, INC.,
doing business as Colonial Hills Hospital;
PIA STAFFORD, INC., doing business as Stafford
Meadows Hospital; PIA WAXAHACHIE, INC., doing
business as Willowbrook Hospital; PSYCHIATRIC
INSTITUTE OF BEDFORD, INC., doing business
as Bedford Meadows Hospital; PSYCHIATRIC INSTITUTE
OF SHERMAN, INC., doing business as Arbor
Creek Hospital; BROOKHAVEN PSYCHIATRIC PAVILION,

                            Defendants-Appellees.

_____

**Appeal from the United States District Court
for the Southern District of Texas**
_____

October 16, 2000

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue is which limitations accrual rule to apply for civil claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68, when injuries occur not only during, but outside, the limitations period. Summary judgment was awarded against Blue Cross and Blue Shield of Texas, Inc. on the ground that its RICO, and other, claims are time-barred. We **VACATE** and **REMAND**.

I.

In September 1991, the Texas Attorney General sued Psychiatric Institutes of America, Inc. (PIA). PIA, now known as NME Psychiatric Hospitals, Inc., is owned by appellee National Medical Enterprises, Inc. The action alleged, *inter alia*, that PIA's psychiatric hospitals deliberately solicited victims and submitted fraudulent claims against the Texas Crime Victims Compensation Fund.

Beginning that October, a Texas state legislative committee conducted hearings to investigate psychiatric hospital abuse in Texas. The hearings, which received extensive media coverage, uncovered evidence that some Texas psychiatric hospitals engaged in

2

deceptive practices to recruit patients and based discharge decisions on insurance coverage.

Lane Melton, who worked in the special claims unit of Blue Cross and Blue Shield of Texas, Inc. (BCBST), and who, in 1991, was also president of the Texas chapter of the National Health Care Antifraud Association, testified before the state committee that November. Melton also had routine communications with the FBI and the offices of the United States Attorney and the Texas Attorney General during their investigations in 1991 of PIA and NME hospitals.

In July 1992, BCBST was asked to join an action filed by other insurers against Appellees. BCBST declined, *not* considering itself a victim of fraud.

In the fall of 1995, in connection with its litigation against another group of psychiatric hospitals, and at the direction of outside counsel, BCBST sent questionnaires to insureds regarding fraudulent claims. In reviewing the responses, BCBST discovered that one of the hospitals being sued had been previously owned by PIA, and that some of the alleged fraud had occurred during PIA's ownership.

In mid-February 1996, BCBST intervened in an action filed in 1995 in Texas state court by former patients against Appellees and others. BCBST alleged: it had provided insurance coverage to persons who received psychiatric or other health care services from

Appellees from 1989-92; and Appellees engaged in a scheme to defraud BCBST through acts and practices calculated to maximize insurance-covered benefits, including deliberately misdiagnosing patients' conditions, determining the length of inpatient care based solely on the amount of insurance coverage, and misrepresenting that services were provided. Claiming fraud, intentional and negligent misrepresentation, and contractual and equitable subrogation, BCBST sought to recover the amount it had paid Appellees from 1989-92, on behalf of covered patients, for unnecessary medical expenses. The action was removed to federal court in late February 1996.

BCBST amended its complaint in April 1997, adding claims for civil RICO, unjust enrichment, and restitution. It filed a second amended complaint that July, presenting the same claims.

That September, Appellees moved to dismiss or strike the second amended complaint, asserting, *inter alia*, that it did *not* allege fraud with the particularity required by FED. R. CIV. P. 9(b). And, approximately two and one-half months later, Appellees moved for summary judgment, contending that BCBST's claims were barred by the applicable statutes of limitations. BCBST responded in early 1998, asserting, *inter alia*: it exercised reasonable diligence in an effort to discover the bases for its claims; and the limitations periods were tolled under the doctrine of fraudulent concealment.

4

That May, the district court granted Appellees' motion to dismiss, holding that BCBST's claims, all of which rested on allegations of fraud, failed to satisfy Rule 9(b)'s particularity standard. The docket entry for that order states that the ruling "moot[ed]" Appellees' summary judgment motion. BCBST's appeal from that order was dismissed by our court for lack of appellate jurisdiction. *Love v. National Med. Enters., Inc.*, No. 98-20606 (5th Cir. 15 Sept. 1998) (unpublished).

In late November 1998, the district court granted the former-patient plaintiffs' motion to sever their claims from BCBST's, and remanded those plaintiffs' claims to state court. Appellees moved for entry of final judgment that December. In addition to opposing the motion, BCBST sought leave to amend its complaint.

On 1 February 1999, without obtaining leave of court, BCBST filed a third amended complaint. It alleged: Appellees engaged in a fraudulent scheme beginning in 1988, and continuing into at least 1993; and BCBST sought to recover the amounts paid to Appellees for allegedly fraudulent insurance claims submitted from 1988 through 1995. In addition to the previous claims, it added civil conspiracy, breach of contract, and ERISA. It also claimed tolling of the statutes of limitations because Appellees allegedly fraudulently concealed facts supporting BCBST's claims, and because some of its claims arise out of the treatment of minors. In mid-February, Appellees moved to strike or dismiss the third amended

complaint, on the grounds that:  it was filed without leave of court; amendment would be futile because BCBST's claims are time-barred; and it failed to satisfy Rule 9(b).

One week later, the district court denied Appellees' motion for entry of final judgment and granted BCBST leave to file the third amended complaint.  But, that April, the court granted summary judgment for Appellees *sua sponte*, holding that all of BCBST's claims are time-barred.

## II.

BCBST contends that the district court erred by:  granting summary judgment *sua sponte* against the new claims in its third amended complaint — civil conspiracy, breach of contract, and ERISA (it does *not* do so for its other claims, even though they were likewise dismissed *sua sponte*); regarding its civil RICO claims, holding recovery is time-barred for insurance claims submitted within the four-year limitations period; and holding that its civil RICO claims accrued when it should have discovered the alleged fraudulent scheme, rather than when it discovered, or should have discovered, its injuries.  In addition, BCBST maintains there is a material fact issue on whether, for all of its claims, which cover the period 1988-95, the limitations periods were tolled by fraudulent concealment and for insurance claims submitted for treatment of minors.

6

We review a summary judgment *de novo*, "viewing all facts, and the inferences to be drawn from them, in the light most favorable to the non-movants". ***Forsyth v. Barr***, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). Such judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". FED. R. CIV. P. 56(c).

"[T]he substantive law will identify which facts are material". ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Id.*; *see* ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 587 (1986).

## A.

First, we reject Appellees' contention that BCBST's notice of appeal was *not* timely filed, resulting in our lacking appellate jurisdiction. BCBST's motion for reconsideration was denied in early May 1999. Its notice of appeal, filed 2 July 1999, was untimely. FED. R. APP. P. 4(a)(1)(A), (4)(a)(4)(B)(ii). But, also on 2 July, within the 30-day period specified in FED. R. APP. P. 4(a)(5)(A)(i), BCBST moved for an extension of time to file its notice of appeal. The motion was granted on 12 July.

7

Appellees maintain: the extension did *not* resuscitate the 2 July notice; and BCBST was required, post-extension, to file another notice of appeal. In granting the extension, however, the district court stated that the notice "shall be filed by July 2, 1999". Having already filed its notice of appeal on that date, BCBST did *not* need to file another.

B.

BCBST challenges the procedure employed by the district court for granting summary judgment *sua sponte* against its civil conspiracy, breach of contract, and ERISA claims, added by the third amended complaint. BCBST relies on the following: Appellees moved for summary judgment *before* BCBST filed that complaint; after it was filed, Appellees did *not* supplement their motion; and the district court did *not* give notice it was considering summary judgment for these new claims. (But, for its other claims, and as noted *supra*, BCBST does *not* claim any procedural improprieties.)

A summary judgment motion "shall be served at least 10 days before the time fixed for the hearing". FED. R. CIV. P. 56(c). Although Rule 56 contemplates such a motion being filed, it is well-settled that a district court may grant summary judgment *sua sponte*, "so long as the losing party has ten days notice to come forward with all of its evidence" in opposition to summary judgment. ***Washington v. Resolution Trust Corp.***, 68 F.3d 935, 939 (5th Cir. 1995); *see also* ***St. Paul Mercury Ins. Co. v. Williamson***,

8

224 F.3d 425, 435 (5th Cir. 2000) (district court may enter summary judgment *sua sponte* if it gives parties at least ten days notice).

Although our court "has strictly enforced [this] ten day notice requirement", *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1397 (5th Cir. 1994) (internal quotation marks and citation omitted), the "failure to provide notice may be harmless error ... when the nonmovant has *no* additional evidence *or* if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact". *Ross v. University of Tex. at San Antonio*, 139 F.3d 521, 527 (5th Cir. 1998) (internal quotation marks and citation omitted; emphasis added); *see also* *St. Paul*, 224 F.3d at 435 (same); *Washington*, 68 F.3d at 939 (reviewing *sua sponte* summary judgment for harmless error).

And, where the party against whom summary judgment is granted moves for reconsideration under FED. R. CIV. P. 59(e), but does *not*, in that motion, challenge the procedural propriety of the summary judgment ruling, our court has reviewed the asserted procedural irregularity, raised for the first time on appeal, *only* for plain error. *See* *Conley v. Board of Trustees of Grenada County Hosp.*, 707 F.2d 175, 178 (5th Cir. 1983). *Cf*. *Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 787 (5th Cir. 1997) ("The fact that St. Paul did not object to the district court's [*sua*

9

*sponte* summary judgment] or request a new trial or rehearing ... indicates that St. Paul had no further evidence to present or argument to make regarding any material dispute of fact."); ***Dayco Corp. v. Goodyear Tire & Rubber Co.***, 523 F.2d 389, 393 (6th Cir. 1975) (although motion to reconsider is *not* prerequisite to appeal, fact that party challenging lack of notice of conversion of motion to dismiss to motion for summary judgment did *not* seek reconsideration by district court or indicate on appeal what additional evidence in opposition to summary judgment it would present on remand, confirms court's conclusion that notice would have served *no* useful purpose).

Following the summary judgment, and although *not* required to do so, BCBST moved for reconsideration. That motion did *not*: raise lack of notice or any other procedural irregularities; describe or present any evidence in opposition to summary judgment; or contend that such evidence could be obtained through further discovery. Thus, the district court had *no* opportunity to correct any procedural errors.

BCBST's briefing on this issue does *not* describe any specific evidence purporting to establish a material fact issue on whether the claims added by the third amended complaint are barred by limitations. Moreover, BCBST does *not* contend it was prevented from presenting any such evidence to the district court as a result of the alleged lack of notice. *See **Nowlin v. Resolution Trust***

10

*Corp.*, 33 F.3d 498, 504-05 (5th Cir. 1994) (lack of notice for *sua sponte* summary judgment was harmless error where nonmovant failed to state what evidence it wanted to present or why it needed more time to respond); *Hoopes v. Equifax, Inc.*, 611 F.2d 134, 136 (6th Cir. 1979) (district court did *not* reversibly err in granting summary judgment without providing ten days notice, where plaintiff failed to demonstrate that he could have produced additional evidence had notice been given).

Under these circumstances, the district court did *not* plainly err by employing the *sua sponte* procedure for the claims added by the third amended complaint. (Our holding, of course, relates *only* to the challenged procedure, *not* to the merits of the claims. *See* part II.C.3.)

### C.

BCBST's petition in intervention was filed on 13 February 1996. The parties agree that BCBST's claims are subject to four-year statutes of limitations.

### 1.

BCBST contends that the district court erred by granting summary judgment against claims that accrued within the limitations period; restated, claims that could *not* have accrued until *after* 13 February 1992 — four years before BCBST's petition was filed. For those claims, the underlying psychiatric treatment did *not* occur,

11

and BCBST's obligation to pay Appellees' insurance claims for such treatment did *not* arise, until after that date — 13 February 1992.

BCBST does *not* state whether this issue encompasses *all* of its claims. As discussed, it presents claims for, *inter alia*, civil RICO, fraud, and unjust enrichment. For this issue, which concerns *only* allegedly fraudulent "insurance claims" submitted within the limitations period, and as discussed *infra*, the only supporting authority BCBST cites is ***Klehr v. A.O. Smith Corp.***, 521 U.S. 179 (1997), which deals *only* with civil RICO claims. Accordingly, we understand this issue is so limited.

a.

According to BCBST, Appellees' alleged scheme to defraud BCBST is a "continuing violation", with a new and independent claim accruing with each submittal of an allegedly fraudulent insurance claim in furtherance of that scheme. Appellees counter that the continuing violation doctrine is inapplicable, maintaining: the insurance claims submitted within the limitations period are *not* injurious acts *separate and independent* from the prior alleged fraudulent scheme; in 1991, *outside the limitations period*, BCBST knew, or should have known, the facts that are the basis of its claims; and BCBST has *not* shown that any of the conduct within the limitations period is distinguishable from the conduct, outside that period, of which BCBST was, or should have been, aware, but for which it failed to timely file suit.

12

i.

As stated, *Klehr* is the sole authority relied on by BCBST. One issue in *Klehr* concerned the Third Circuit's "last predicate act" accrual rule for civil RICO actions. The Supreme Court assumed the rule meant that, so long as the defendant committed one predicate act within the limitations period, the plaintiff could recover, *not only* for the injury caused by that act, *but also* for the injuries caused by all of the acts comprising the pattern of racketeering activity. 521 U.S. at 186-87.

The Court rejected the "last predicate act" accrual rule because, *inter alia*, it was "inconsistent with the ordinary Clayton Act rule, ... under which a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business". *Id*. at 188 (internal quotation marks and citations omitted). The Court noted: when it had held that the Clayton Act's four-year limitations period applied to civil RICO claims, it had explained that "Congress consciously patterned civil RICO after the Clayton Act". *Id*. at 188-89 (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987)).

To illustrate why the Third Circuit's "last predicate act" accrual rule went "too far", because it would allow a plaintiff to recover for acts outside the limitations period, the Court used the antitrust law "continuing violation" doctrine. *Id*. at 189. Under that doctrine, each overt act that is part of a continuing

13

violation and causes injury to the plaintiff "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times", *id*. (internal quotation marks and citation omitted), but generally does *not* allow a plaintiff to recover for the injury caused by overt acts outside the limitations period. *Id*.

The Court noted that, similarly, the "separate accrual" rule applied by some circuits for civil RICO actions allowed recovery for injury caused by the commission of a separable, new predicate act within the limitations period, but, like the antitrust continuing violation doctrine, *did not permit* "the plaintiff [to] use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period". *Id*. at 190.

This "separate accrual" rule for civil RICO actions had earlier been adopted by the Second Circuit in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007 (1989), which held: "each time a plaintiff suffers an injury caused by a [RICO] violation ..., a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury". *Id*. at 1102. This "separate accrual" rule is a variant of the "injury discovery" rule adopted by our court in *Rotella v. Wood*, 147 F.3d 438, 440 (5th Cir. 1998), *aff'd*, 528 U.S. 549 (2000).

14

Under the "injury discovery" rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury. *Id*. When a pattern of RICO activity causes a continuing series of separate injuries, the "separate accrual" rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury. *Bankers Trust*, 859 F.2d at 1102.

The Second Circuit relied on two sources as support for the "separate accrual" rule, the first of which is RICO's plain language: a civil RICO action may be filed only by a "person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962". *Id*. (quoting 18 U.S.C. § 1964(c)). "Until such injury occurs, there is no right to sue for damages under § 1964(c), and until there is a right to sue under § 1964(c), a civil RICO action cannot be held to have accrued". *Id*.

The court noted, however, that, "[e]ven after injury has occurred, ... and a civil RICO claim has accrued, there will frequently be additional, independent injuries that will result from the same violation of § 1962, but which, because they will not occur until some point in the future, are not yet actionable as injuries to plaintiff's business or property". *Id*. at 1103. Because a single RICO violation consists of a "pattern" of illegal acts, "each of which, standing alone, may injure a plaintiff", multiple injuries may be caused by a single RICO violation. *Id*.

15

Recognizing the potential for such multiple injuries, "[C]ongress tied the right to sue for damages under § 1964(c), not to the time of the defendant's RICO violation, but to the time when plaintiff suffers injury to 'his business or property' from the violation". *Id*. "The logical end result is that a plaintiff may sue for any injury he discovers or should have discovered within four years of the commencement of his suit, regardless when the RICO violation causing such injury occurred". *Id.*

The Second Circuit's second source of support for this "separate accrual" rule was the Clayton Act, which, as noted, had been recognized by the Supreme Court as the pattern for RICO's civil action provision. *Id*. at 1103-04. "Generally, a cause of action under the Clayton Act accrues and the statute of limitations begins to run, when a defendant commits an antitrust violation that injures a plaintiff's business". *Id*. at 1104. Specifically, the Second Circuit found support for its "separate accrual" rule in the "continuing violation" doctrine of antitrust law, under which a cause of action for damages accrues "each time plaintiff suffers an injury caused by an illegal act of defendants". *Id*. Under that doctrine, damages for future injuries for which no separate claim has yet accrued are recoverable, unless "the fact of their accrual is speculative or their amount and nature unprovable". *Id*. (internal quotation marks and citation omitted).

16

The court recognized that its adoption of the "separate accrual" rule resulted in "rejecting the general federal rule of accrual, which requires in cases involving continuing violation and continuous injury that the statute of limitations begin running upon the commission of the first overt act causing damage, and does not permit a subsequent injury to start the limitations period running anew". *Id*. at 1104-05. "Such a rejection [was] mandated by the continuing violations and injuries sought to be remedied under RICO and the Clayton Act." *Id*. at 1105. "'Otherwise, future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery'". *Id*. (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 340 (1971)).

Although our court has neither adopted nor rejected the "separate accrual" rule of *Bankers Trust*, we have, as stated, adopted the underlying "injury discovery" rule upon which the "separate accrual" rule is based. *Rotella*, 147 F.3d at 440. Our court having adopted the "injury discovery" rule, it would seem illogical to conclude that, under civil RICO, a plaintiff may *not* recover for injuries incurred within the limitations period, merely because they result from acts that are part of a continuing pattern of similar acts that caused other, similar injuries outside that period.

In this regard, the Supreme Court's most recent decision on the accrual of civil RICO actions, the earlier-cited **Rotella v. Wood**, 528 U.S. 549 (2000), rejected an "injury and pattern" discovery rule of accrual, "under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury *and* a pattern of RICO activity". *Id*. at ___, 120 S. Ct. at 1080 (emphasis added). The Court did *not* decide, however, whether an "injury discovery" or "straight injury occurrence" rule should apply for such actions. *Id*. at ___, 120 S. Ct. at 1080 & n.2.

Nor did it "decide whether civil RICO allows for a cause of action when a second predicate act follows the injury, or what limitations accrual rule might apply in such case". *Id*. at ___, 120 S. Ct. at 1083 n.4. But, in rejecting the "injury and pattern discovery" rule, the Court explained that such a rule "would clash with the limitations imposed on Clayton Act suits". *Id*. at ___, 120 S. Ct. at 1082.

> In rejecting a significantly different focus under RICO, ... we are honoring an analogy that Congress itself accepted and relied upon, and one that promotes the objectives of civil RICO as readily as it furthers the objects of the Clayton Act. Both statutes share a common congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the respectively prohibited practices.

*Id*. at ___, 120 S. Ct. at 1082.

As is evident from the foregoing discussion of the Second Circuit's opinion in **Bankers Trust**, the "continuing violation" doctrine applicable in Clayton Act cases is very similar to the "separate accrual" rule applied by that court in the civil RICO context. In the light of the Supreme Court's heavy reliance on the Clayton Act model in resolving civil RICO accrual issues, and the similarity between the antitrust continuing violation doctrine and the "separate accrual" rule adopted by the Second Circuit, we perceive *no* barrier to our adopting the "separate accrual" rule for civil RICO actions. Moreover, as discussed, such a rule is consistent with, and based on, the "injury discovery" rule previously adopted by our court. It is well-suited for cases, such as this, in which a pattern of RICO activity is alleged to have caused a continuing series of similar, independent injuries. Accordingly, we hold that the **Bankers Trust** "separate accrual" rule applies in civil RICO actions.

ii.

Appellees contend that the "separate accrual" rule does *not* apply to BCBST's claims, maintaining: the "continuing conduct" alleged by BCBST (submission of allegedly fraudulent insurance claims within the limitations period) is *not* an injurious act *separate* from the alleged prior misconduct (submission, outside the period, of other such claims), all stemming from the same alleged scheme to defraud. We disagree.

19

Each time BCBST became obligated to pay a fraudulent (assumed) insurance claim submitted by Appellees, BCBST suffered an injury "to its business or property", within the meaning of 18 U.S.C. § 1964(c). Until it became so obligated, it had *not* suffered an injury as the result of the submission of that claim. Obviously, for that submittal, it could *not* have suffered any injury before Appellees submitted the claim for payment.

Had BCBST filed suit in 1991, when Appellees assert that BCBST knew, or should have known, of the alleged fraudulent scheme, BCBST could *not* have recovered damages for future fraudulent insurance claims. First, it had *not* yet suffered injury by becoming obligated to pay such future claims. And, second, "'the fact of their accrual [would be] speculative [and] their amount and nature unprovable'". **Bankers Trust**, 859 F.2d at 1104 (quoting **Zenith**, 401 U.S. at 339).

b.

Alternatively, Appellees maintain there is *no* competent summary judgment evidence to support BCBST's claims for allegedly fraudulent insurance claims within the limitations period.

BCBST's third amended complaint includes allegations regarding Appellees' fraudulent insurance claims for patients for whom treatment was rendered, and for whom insurance claims arising from that treatment were submitted, within the limitations period — after 13 February 1992. In opposition to summary judgment, BCBST

20

submitted an affidavit by Rogers, a BCBST senior investigator and custodian of electronically recorded data, with an attached summary of the insurance claims made by Appellees for each patient covered by BCBST. Provided for each claim were the treatment date and facility, as well as the amount and date of payment.

The affidavit stated: records were kept by Rogers in the regular course of BCBST's business; it was in the regular course of business for a BCBST employee, with knowledge of the data recorded, to make the records or to transmit information to be included in them; the records were made at or near the time of the events, or reasonably soon thereafter; the attachment "represent[ed] a summary of voluminous, recorded electronic data, depicting hospital claims paid during the relevant period"; and the summarized records were available for inspection.

Appellees contend that Rogers' affidavit does *not* properly authenticate or establish the admissibility of the information in the summary. They challenge the affidavit on the grounds that it: does *not* mention the electronic process or system used to produce the data; does *not* demonstrate that the computer system used produces an accurate result; and fails to demonstrate, *inter alia*, that it does *not* contain mere accumulations of hearsay. In district court, Appellees so objected to the affidavit and attached summary.

21

Although the district court did *not* expressly rule on the objections, the order granting summary judgment states that the court considered the parties' "submissions", presumably including Rogers' affidavit and summary. For our *de novo* review of a summary judgment, we still apply the manifest-error standard of review to the district court's evidentiary rulings. *Lavespere v. Niagara Mach. & Tool Works*, 910 F.2d 167, 175-76 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993).

Affidavits supporting or opposing summary judgment must "set forth such facts as *would be* admissible in evidence". FED. R. CIV. P. 56(e) (emphasis added). Accordingly, "[a]lthough the summary judgment evidence need not be in 'a form that would be admissible at trial,' ... the party opposing summary judgment must be able to prove the underlying facts". *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). For example, evidence may be authenticated by testimony of a witness with knowledge that a matter is what it is claimed to be. FED. R. EVID. 901(b)(1). And, "[t]he contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of

a ... summary", *provided* that the documents on which it is based are "made available for examination or copying, or both". FED. R. EVID. 1006.

Rogers' affidavit satisfies Rule 56(e). As the custodian of the summarized records, he was a witness with the requisite knowledge to testify that the attachment was what it was claimed to be. The affidavit stated that the summarized documents were available for inspection. And, under FED. R. EVID. 801(d)(2) (admissions by party-opponent), the claims submitted *by Appellees* were *not* hearsay. *See* **United States v. Sanders**, 749 F.2d 195, 198 (5th Cir. 1984) (Medicaid claim forms submitted by defendant or his agents qualify as admissions). Finally, the records of payment by BCBST were admissible under the business records exception, FED. R. EVID. 803(6). *See* **Sanders**, 749 F.2d at 199.

2.

The district court held: as early as 1991, BCBST was, or should have been, aware of Appellees *allegedly fraudulent conduct;* BCBST was therefore on notice it may have been injured; but it failed to exercise reasonable diligence to investigate and discover its injury. BCBST contends: although the district court correctly stated that BCBST's claims accrued when BCBST knew, or should have known, of its *injury*, it erroneously applied, instead, a "fraud discovery" accrual rule to BCBST's RICO claims, holding that "BCBST

23

was aware or should have been aware *of the fraud* as early as 1991".
(Emphasis added.)

Appellees counter that the district court did *not* err by referring to discovery both of the injury and the fraud, asserting that the "injury discovery" rule is fully consistent with accrual occurring upon discovery of the fraud. Appellees maintain that, because BCBST had actual knowledge in 1991 of the alleged fraud, it was, at the very least, on inquiry notice of its injury, but failed to exercise reasonable diligence to investigate and discover such injury.

As stated, our court adopted the "injury discovery" rule in *Rotella*, 147 F.3d at 440 (RICO claim accrues "upon the discovery of the *injury* in question" (emphasis added)). But, our court stated that such adoption was "fully consistent", *id.*, with *Daboub v. Gibbons*, 42 F.3d 285, 291 (5th Cir. 1995) ("even if the discovery rule did apply", RICO claim was barred by limitations because plaintiffs knew about defendant's "actions" more than four years before filing suit), and *La Porte Construction Co. v. Bayshore National Bank*, 805 F.2d 1254, 1256 (5th Cir. 1986) (for RICO civil action, "period of limitations does not commence until the injured party discovers, or, in the exercise of reasonable diligence, should have discovered, the alleged *fraud*"; "exercise of reasonable diligence would have led to the discovery of the *fraud*" (emphasis added)). Appellees rely on this passage from *Rotella* to support

24

their contention that a "fraud-discovery" rule is consistent with the "injury discovery" rule.

Similarly, the *Rotella* plaintiff contended that adoption of an injury discovery rule, rather than the injury pattern discovery rule he preferred, would conflict with *Daboub* and *La Porte*. In rejecting that contention, our court stated that, because "neither case mentions or even implies a requirement of discovery of a pattern of racketeering activity with regard to the accrual of a civil RICO cause of action", *Rotella*, 147 F.3d at 440, *Daboub* and *La Porte* were "fully consistent" with adopting the injury discovery rule. *Id*. Accordingly, Appellees read too much into that passage when they construe it as supporting the proposition that discovery of fraud is the same as discovery of the resulting injury.

As BCBST notes, the district court correctly stated the applicable injury discovery rule. But, as noted, in applying that rule, the court concluded: "BCBST was aware or should have been aware *of the fraud* as early as 1991". (Emphasis added.) As evidence of "BCBST's awareness of *the fraud*", the district court relied on evidence of BCBST's cooperation with the FBI in its investigation of insurance fraud by Appellees; BCBST's suspicion that it might have been a victim of fraud and its resulting "preliminary, yet incomplete, in-house investigation of false claims"; and BCBST's awareness of media reports concerning the filing of fraudulent claims by psychiatric hospitals, including the

25

Texas Attorney General's investigation of Appellees.  The court concluded:  those "events gave BCBST reasonable 'notice' that it *may have been injured* and may have [had] a cause of action against one or more Defendants".  (Emphasis added.)

The district court quoted ***Landry v. Air Line Pilots Association International AFL-CIO***, 901 F.2d 404, 413 (5th Cir.), *cert. denied*, 498 U.S. 895 (1990), for the proposition that "ignorance of one aspect of an alleged fraud, where many other facts were known, is insufficient to delay the running of the statute".  But, that portion of ***Landry*** addressed the accrual of labor law, *not* civil RICO, claims.  Because the RICO statute requires a showing of "injur[y]", 18 U.S.C. § 1964(c), and the injury discovery rule calculates accrual from the discovery of that *injury*, accrual of a civil RICO claim is delayed until the plaintiff is aware, or should have been aware, of the injury.

To the extent that the district court's opinion could be interpreted as holding that BCBST's civil RICO claims accrued when it became aware in 1991 of Appellees' allegedly fraudulent conduct, such a conclusion would be erroneous, because, again, under the injury discovery rule, the claims did *not* accrue until BCBST knew, or should have known, that it suffered an injury caused by that allegedly fraudulent conduct.  But, we think it reasonably clear that the district court's references to BCBST's awareness of "the fraud" were intended to mean that the court had determined that

26

BCBST's awareness of Appellees' alleged fraudulent conduct was sufficient to place BCBST on notice that it might be a victim of that conduct (injury), and triggered its duty to exercise reasonable diligence to discover whether it had been injured. Implicit in the court's conclusion that BCBST failed to exercise reasonable diligence to investigate whether it was a victim of the alleged fraud of which it was aware in 1991 is the further conclusion that, had it done so, BCBST would have discovered its alleged injuries.

BCBST concedes:  in 1991, it learned of a scheme by Appellees to charge varying amounts for the same medication and to discharge patients upon exhaustion of insurance coverage; it conducted an investigation into whether there were variations in medication charges or correlation between insurance coverage and length of hospitalization; but it found nothing.  It contends, however, that it was *not* aware of *the type of fraudulent conduct* that caused its injuries:  Appellees' use of medical doctors to falsify diagnoses and medical records.

Regarding BCBST's investigation, the summary judgment evidence includes excerpts from the deposition of the earlier-referenced Lane Melton, whose duties during his BCBST employment included investigating questionable claims and, when warranted, seeking prosecution.  He stated:  in 1991, he became aware of allegations of fraud and abuse in Texas psychiatric hospitals; he became

27

concerned that BCBST might be paying fraudulent claims; he spoke with employees who handled claims, to determine whether BCBST was paying fraudulent claims, but did *not* talk to PIA doctors or patients; he spoke with an employee named "Betty" in BCBST's psychiatric health unit, who told him Appellees submitted large claims, but if there were claims that raised concerns of fraud or over-billing, BCBST denied them; and he did *not* see enough indicators of fraud to then warrant a full-fledged investigation.

BCBST also submitted other summary judgment evidence that: in part as a result of the allegations of fraudulent conduct by psychiatric hospitals in 1991, it instituted new procedures, including per diem billing, pre-certification requirements, onsite inspections, and review of claims by subcontracted private physicians, to attempt to eliminate the potential for fraudulent claims; and it believed those procedures had eliminated, or controlled, the possibility of fraudulent insurance claims.

BCBST also submitted the affidavit by one of its litigation department attorneys, which stated: in 1991, BCBST did *not* know, as a result of the publicity, other lawsuits, and governmental investigations, that Appellees had enlisted medical doctors to falsify diagnoses and medical records; in the fall of 1995, it learned, for the first time, that fraudulent claims containing false diagnoses had been made against it by one of the Appellees; this knowledge was gained upon receipt of questionnaires sent to

28

patients, at the direction of outside counsel in connection with litigation with another hospital group, one of whose hospitals had previously been owned by PIA; and, because of the sensitivity of psychiatric treatment, it was *not* BCBST's regular practice to send such questionnaires to insureds.

Appellees contend that this evidence is insufficient to permit a rational trier of fact to conclude that BCBST performed a reasonably diligent investigation to determine whether it had been injured by the allegedly fraudulent conduct. Restated, they maintain there is *no* material fact issue on this point. According to Appellees: BCBST's discovery of its injuries through the use of questionnaires in 1995 demonstrates that use of a similar procedure in 1991 would have revealed the same information; and BCBST's explanation for why it did *not* do so is inadequate.

There is *no* summary judgment evidence that, prior to 1995, BCBST knew that Appellees' allegedly fraudulent conduct included falsification of diagnoses and medical records. Moreover, there is *no* summary judgment evidence that insurers routinely contact insureds to verify treatment. BCBST submitted evidence that it did so only at the direction of outside counsel in existing litigation. BCBST also submitted evidence that it sent "Explanation of Benefit" forms to its insureds, to advise them of benefits paid on their behalf, and never received a complaint that the services were *not* rendered *or* were inappropriate.

In the light of the summary judgment record, we *cannot* conclude, as a matter of law, that BCBST's efforts to investigate whether it was a victim of — had been injured by — the allegedly fraudulent conduct of which it was aware in 1991 (varying charges for the same medication and discharge decisions based on insurance coverage), including *not* seeking information from its insureds through the use of questionnaires or otherwise, were *not* reasonably diligent.

3.

Finally, seeking recovery for all payments of the allegedly fraudulent insurance claims, including those prior to 13 February 1992, BCBST contends that the district court erred by failing to hold there is a material fact issue regarding whether the statutes of limitations for *all* of its claims were tolled by other doctrines.

a.

First, BCBST asserts that there is a material fact issue regarding whether the limitations periods are tolled by fraudulent concealment. Under that doctrine, the limitations period is tolled until the plaintiff discovers, or with reasonable diligence should have discovered, the concealed fraud. *Klehr*, 521 U.S. at 194; *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).

30

BCBST maintains that the alleged fraud was "self-concealing" because the purpose of the scheme created by Appellees was to prevent insurers from discovering that the psychiatric admissions were fraudulent. Alternatively, it contends it submitted uncontroverted evidence that Appellees committed affirmative acts to conceal their fraudulent activities.

In opposition to summary judgment, BCBST submitted affidavits of former employees of Appellees as evidence of affirmative acts of concealment. That by a former intake coordinator for one hospital owned by Appellees stated: he knew what type of coverage was available through BCBST and other insurers, and tailored diagnoses to fit insurance coverage; occasionally, the hospital admitted patients under the name of someone else who was insured; he coerced all callers to come to the hospital and all visitors to be evaluated, and was prepared to admit all who were evaluated, regardless of the result of the evaluation; and efforts were made to conceal such conduct from BCBST and other insurers.

The affidavit of another individual employed by PIA from December 1990 to October 1991 stated: she performed case management utilization review to coordinate with insurance companies such as BCBST, to provide clinical information about patients in order to obtain approval for payment; PIA created and used a "no-no" diagnosis list, for diagnoses that were *not* covered by insurance, and instructed employees and physicians to use it in

31

falsifying diagnoses to obtain insurance coverage; her duties included coercing physicians to change diagnoses when necessary to obtain coverage; when responding to BCBST requests for medical records, she was instructed that, before providing the requested information to BCBST, she was to redact records in order to remove information reflecting patient improvement; and she attended "charting parties" conducted by Appellees for the purpose of fabricating charts, after patients were discharged.

Appellees maintain that the affidavits BCBST relies on to show affirmative acts of concealment are *not* competent summary judgment evidence, because they contain conclusory remarks, opinions of ultimate fact and legal conclusions, and statements without record support. Appellees so objected in district court, but the court did *not* expressly rule on the objections. As noted, its opinion states it considered the parties' "submissions". Even assuming portions of the affidavits are objectionable on the grounds asserted by Appellees, they contain statements, based on personal knowledge, from which a reasonable jury could find acts of concealment.

Appellees contend further that the fraudulent concealment doctrine does *not* apply because, in 1991, BCBST knew facts that would have alerted any reasonable person to investigate and pursue its claims. Appellees maintain that the evidence conclusively establishes that BCBST did *not* then act with reasonable diligence,

32

because, when it exercised such diligence in 1995, by sending questionnaires to patients, it discovered its alleged injury. As discussed, there is a material fact issue whether BCBST exercised reasonable diligence to determine whether it was a victim of Appellees' allegedly fraudulent conduct. Accordingly, summary judgment concerning fraudulent concealment was inappropriate.

### b.

We reject BCBST's contention that there is a material fact issue regarding tolling for its subrogated claims for treatment of minors. There is *no* evidence of any contract giving rise to such subrogation rights. The doctrine of equitable subrogation does *not* apply, because BCBST asserts direct claims against Appellees; its rights are based *not* upon payment of the debt of another, but upon payment of its own debt.

### III.

For the foregoing reasons, the summary judgment is **VACATED**, and this case is **REMANDED** for further proceedings.

*VACATED and REMANDED*

33