**Opinion issued December 31, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00418-CV

———————————

**GREGORY SULLO AND BRIAN ZIMMERMAN, Appellants**

**V.**

**FELIX MICHAEL KUBOSH A/K/A KUBOSH BAIL BONDING, PAUL KUBOSH A/K/A KUBOSH LAW OFFICE, Appellees/Cross-Appellants**

**V.**

**WILLIAM CARTER, SANDRA ARNAEZ, JASON ROCHA, EDUWIGIS SUASTE, SARA PADILLA, GRANT HIGHTOWER, WALTER LETHERMON, JONATHAN GLENN, KREGG GIBSON, GERRY CHANEY, JUAN ALVAREZ, JAIME GAYTKO, EDWARD CARNEY, PAUL COLLINS, CIRINO HERNANDEZ, PRESTON BAWA, MONICA WIRZ, EDRICH MACK, MERCY HAYES, JOSE ALAMO, RUBY SEPULVEDA, SEAN SIMON, KRISTAL OROZCO, JANET RAMIREZ-HERRERA, BALTAZAR MARTINEZ, SHELTON HARRIS, RANDALL STEVISON, BRIAN ARELLANO, FELIPE CAVAZOS, LARRY RICHARD, JEFFERY RHODES, HECTOR CUEVAS, CYNTHIA SANCHEZ, GINA TORRES, ROBERTO LARES, LEON TOUSANT, LINDA MARTIN, GREGORY BARNES, ELIZABETH GUERRERO, ALEICIA ROBERTS, ANA REYES, DERRICK RIVERS, DEVIN BARRIOS, CHRISTINA VILLANUEVA, PRISCILLA MUNOZ, JEANETTE MAYA, ERIC AYALA,**

**FARID ABI-SAAB, JOE PECINA, ANDREW RAMIREZ, MAURICIO MENDEZ-BARRERA, MIGUEL DIAZ, PATRICK WASHINGTON, EARL CHILTON, DOROTHY SCOTT, THOMAS PITTARD, JUANITA MARIN, JULIO TORRES, RAYMOND FORD, VIRGINIA KNAUFF, CHERRY AYO-VAUGHN, JOSE CAMPA, ONYEKACHI EKEZIE, RIGGO DOMINGUEZ, MARQUIS WILLIAMS, RICARDO TREVINO, JESUS CASTRO, EDUARDO VALDEZ, BOLIVAR SIERRA, EVA CASTILLO, GUSTAVO GARCIA, SETTEA MENEDO, MICHAEL YOUNGBLOOD, AND BRANDON NASH, Cross-Appellees**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-50819**

---

## OPINION ON REHEARING

Appellants, Gregory Sullo and Brian Zimmerman, filed motions for rehearing of our November 19, 2019 opinion. We deny appellants' motions for rehearing, but we withdraw our November 19, 2019 opinion and judgment and issue this opinion and judgment in their stead. Our disposition remains unchanged.

This interlocutory appeal arises out of three consolidated lawsuits filed by William Carter and seventy-three other plaintiffs (collectively, "the Carter parties") against Felix Michael Kubosh, Kubosh Bail Bonding, Paul Kubosh, and Kubosh Law Office (collectively, "the Kuboshes") for violation of a civil statute prohibiting barratry. During the course of this litigation, the Kuboshes filed suit against Brian Zimmerman, the Carter parties' counsel of record, and Gregory Sullo, an attorney at Sullo & Sullo, LLP, a law firm that had initially represented the Carter parties before

2

engaging Zimmerman to file suit on their behalf. Sullo, Zimmerman, and the Kuboshes all filed motions to dismiss the claims against them under the Texas Citizens Participation Act ("TCPA" or "the Act"). The trial court denied all three motions to dismiss.

Sullo, Zimmerman, and the Kuboshes all appealed. Each of the appellants and cross-appellants argue that the trial court erred in denying their respective motions to dismiss under the TCPA.

We affirm the trial court's denial of all three TCPA motions to dismiss.

## BACKGROUND

Andrew Sullo and his brother, Gregory Sullo, are attorneys and partners in the Houston law firm of Sullo & Sullo, LLP. Andrew Sullo and Sullo & Sullo are third-party defendants in the underlying proceedings, but they were not parties to the TCPA motions discussed in this opinion and are not parties to this interlocutory appeal. Attorneys at Sullo & Sullo practice in multiple areas of the law, including, relevant to this case, defense and bonding services for traffic tickets and warrants arising out of unpaid tickets. Their competitors include Kubosh Bail Bonding, which is owned and operated by Felix Michael Kubosh, and Kubosh Law Office, which is owned and operated by Paul Kubosh.

**A. Civil and Criminal Statutes and Disciplinary Rule Prohibiting Barratry**

In 2011, the Texas Legislature passed Texas Government Code section 82.0651, entitled "Civil Liability for Prohibited Barratry." This statute provides, in relevant part:

> (c) A person who was solicited by conduct violating Section 38.12(a) or (b), Penal Code, or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas, regarding barratry by attorneys or other persons, but who did not enter into a contract as a result of that conduct, may file a civil action against any person who committed barratry.
>
> (d) A person who prevails in an action under Subsection (c) shall recover from each person who engaged in barratry:
>
> > (1) a penalty in the amount of $10,000;
> >
> > (2) actual damages caused by the prohibited conduct; and
> >
> > (3) reasonable and necessary attorney's fees.
>
> (e) This section shall be liberally construed and applied to promote its underlying purposes, which are to protect those in need of legal services against unethical, unlawful solicitation and to provide efficient and economical procedures to secure that protection.

TEX. GOV'T CODE ANN. § 82.0651(c)–(e). This statute became effective on September 1, 2011.

Penal Code section 38.12(a), entitled "Barratry and Solicitation of Professional Employment," provides that a person commits the criminal offense of barratry if, with intent to obtain an economic benefit, the person:

> (1) knowingly institutes a suit or claim that the person has not been authorized to pursue;

4

(2)     solicits employment, either in person or by telephone, for himself or for another;

(3)     pays, gives, or advances or offers to pay, give, or advance to a prospective client money or anything of value to obtain employment as a professional from the prospective client;

(4)     pays or gives or offers to pay or give a person money or anything of value to solicit employment;

(5)     pays or gives or offers to pay or give a family member of a prospective client money or anything of value to solicit employment; or

(6)     accepts or agrees to accept money or anything of value to solicit employment.

TEX. PENAL CODE ANN. § 38.12(a).

Section 38.12(b) provides that a person commits an offense if the person:

(1)     knowingly finances the commission of an offense under Subsection (a);

(2)     invests funds the person knows or believes are intended to further the commission of an offense under Subsection (a); or

(3)     is a professional who knowingly accepts employment within the scope of the person's license, registration, or certification that results from the solicitation of employment in violation of Subsection (a).

*Id.* § 38.12(b).

Penal Code section 38.12 dovetails with Rule 7.03(a) and (f) of the Texas Disciplinary Rules of Professional Conduct, which provides:

(a)     A lawyer shall not by in-person contact, or by regulated telephone or other electronic contact as defined in paragraph (f) seek professional employment concerning a matter arising out of a particular occurrence or event, or series of occurrences or

5

events, from a prospective client or nonclient who has not sought the lawyer's advice regarding employment or with whom the lawyer has no family or past or present attorney-client relationship when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain. . . .

. . . .

(f)     As used in paragraph (a), "regulated telephone or other electronic contact" means any electronic communication initiated by a lawyer or by any person acting on behalf of a lawyer or law firm that will result in the person contacted communicating in a live, interactive manner with any other person by telephone or other electronic means. For purposes of this Rule a website for a lawyer or law firm is not considered a communication initiated by or on behalf of that lawyer or firm.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 7.03(a), (f), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9).

## B.     Sullo's "Price Match Program" and Initial Contact with the Carter Parties

Almost immediately after the civil barratry statute, Government Code section 82.0651, became effective in September 2011, Andrew Sullo informed individuals who inquired about bonds and representation for traffic tickets that were in "warrant status" that his office had a "price match program." Under this program, the individual would call a competing bail bond company to receive a quote for the price of the bond, and Sullo promised that his office would beat the quoted price by ten dollars. Prior to the individual's making the phone call, Sullo and the individual

would review a "Disclosure & Agreement" form that described the price match program. This form included a paragraph that stated:

> **II.    Potential Legal Action** — Attorney [Sullo] has reason to suspect that upon Client [the respective individual] making Client's Price Match phone call to the bond company, the Bond Company will transfer the call to a law firm without Client's request or consent. *Attorney believes this action may give rise to a civil cause of action against the bond company or law firm under a new barratry statute or other law which, if successful, may result in money damages for Client.* In some instances, the bond company may also quote on behalf of an attorney or law firm which may also give rise to a cause of action. Client agrees to make this phone call knowing that these potentially illegal or unethical actions may occur by the bond company or law firm. After Client's phone call, Attorney will discuss with Client the potential for a legal cause of action by Client against the bond company. If Client wishes to pursue a legal cause of action against the bond company and Attorney believes a legal cause of action does indeed exist, Client will be required to sign a separate contact agreement with Attorney. By signing this Disclosure & Agreement, Client is not committed or obligated to hire Attorney to pursue a legal cause of action against the bond company.

(Emphasis added). The form also asked each individual for their permission to record their phone call to the competing bond company, stating, "This recording may be used, with Client's consent, to help prove the illegal and unethical action by the bond company or law firm."

The program targeted the Kuboshes' law firm and bail bond company. Prior to the program participants' making their phone calls, Sullo provided each individual with a printed instruction sheet that set out certain questions for the participant to ask. These questions included whether the quoted price for the bond included

7

attorney representation and whether the individual should report to the office of Kubosh Bail Bonding or Kubosh Law Office—which were located adjacent to each other—to complete paperwork.

All seventy-four Carter parties called Kubosh Bail Bonding, and, in each case, an employee of Kubosh Bail Bonding answered the phone. When the Carter parties informed the employee that they had unpaid traffic tickets that were in warrant status, the employee transferred the call to Kubosh Law Office. A Kubosh Law Office employee then asked each of the Carter parties questions about their tickets, quoted them a price, and stated that the price included both the bond and legal representation because the office did not offer bonding services without legal representation. After the phone call ended, each of the Carter parties signed an attorney-client agreement with Sullo, in which the individual "retain[ed] Attorney to prosecute all claims against all necessary defendants arising from possible acts of barratry committed in attempting to obtain legal services." The representation contract included a provision allowing Sullo to associate with other attorneys and law firms to prosecute the case. Eventually, each of the cases was referred to Brian Zimmerman of Zimmerman Axelrad and Joe Fisher of Provost Umphrey. Each of the Carter parties ultimately signed a new attorney-client contract agreeing to the referral and to the division of any recovered attorney's fees among counsel.

Most of the Carter parties made their phone calls to Kubosh Bail Bonding in September and October 2011, although several of the Carter parties made calls in 2012 and 2013. Seventy-two of the Carter parties met Sullo in his Houston office and made their phone calls there. Two of the Carter parties, Michael Youngblood and Brandon Nash, had traffic tickets from the City of Houston, but they were Beaumont residents, and both of these individuals met with Sullo in a conference room at the Beaumont office of Provost Umphrey to make their calls.

## C. The Civil Barratry Lawsuits

Michael Youngblood, with Brian Zimmerman as his counsel of record, filed suit against the Kuboshes in Jefferson County, where he resided, on April 5, 2013. He asserted that the Kuboshes had violated the civil barratry statute, Government Code section 82.0651, and he alleged:

> On or about September 19, 2012, Plaintiff contacted Kubosh Bail which is owned and operated by Michael Kubosh. Plaintiff had three traffic tickets on which he needed to post bonds because they were in "warrant status." Plaintiff contacted Kubosh Bail after receiving a Kubosh Bail Bonding business card containing Mike Kubosh's name, cell phone number, and office number. Based on this contact information, Plaintiff dialed the telephone number advertised on Mike Kubosh's bail bond business card. A certified transcript of the telephone conversation is attached hereto as **Exhibit "A."**

> A representative for Kubosh Bonding Company answered the telephone and identified the business as "Kubosh Bonding Company." After Plaintiff informed the representative of Kubosh Bail that he needed a quote for bonds for traffic tickets, the representative placed Plaintiff's call on hold. Shortly thereafter, a different representative answered the telephone, and then identified the business as "Kubosh

9

Law." *See* **Exhibit "A."** Upon information and belief, Kubosh Law is owned and operated by Paul Kubosh.

The Kubosh Law representative then quoted Plaintiff a price for a bond for his traffic cases. The representative from Kubosh Law further indicated that the price quoted for a bond included the posting of the bond ***as well as the fee for an attorney to represent Plaintiff on his traffic cases.*** Plaintiff **never** sought an attorney to represent him in connection with obtaining his bond. *Id.*

He attached to his pleading a transcript of a conversation he had had with Michael Kubosh, which included a notation that an "unidentified male" whispered an instruction to Youngblood that he answer "no" to a particular question. This "unidentified male" was later identified as Andrew Sullo.

William Carter, with Zimmerman as his counsel of record, filed suit in Harris County against the Kuboshes for violation of the civil barratry statute on August 28, 2013. Over the next two months, Carter amended his petition several times to add a total of seventy-one additional plaintiffs. The factual allegations in Carter's petitions were substantively identical to the allegations in Youngblood's petition. The Kuboshes answered Carter's lawsuit on September 30, 2013, and they asserted counterclaims, including claims for injunctive and declaratory relief relating to their contention that the civil barratry statute violated their constitutional rights.

Brandon Nash, also with Zimmerman as counsel of record, filed a separate suit in Jefferson County against the Kuboshes for violation of the civil barratry

statute on October 1, 2014. The factual allegations in his petition were substantively identical to the allegations in Youngblood's and Carter's petitions.

## D. The Kuboshes' Counterclaims and Third-Party Claims

During the course of discovery on the Carter parties' claims and the Kuboshes' counterclaims in this litigation, the Kuboshes learned that Andrew Sullo had been involved with the Carter parties and their calls to the Kuboshes. On October 21, 2014, the Kuboshes amended their counterpetition against the Carter parties and filed a third-party action against Andrew Sullo and his law firm, Sullo & Sullo, LLP. The Kuboshes' amended counterpetition contained the following allegations:

> [Andrew] Sullo orchestrated each and every *Carter* Plaintiff's and another 64 barratrously-solicited strangers' calls from Sullo's own [Sullo & Sullo] office (as well as other locations) to Kubosh Bonding using phone numbers Sullo provided each *Carter* Plaintiff, along with pretextual "price match" scripts, and previously-prepared form affidavit instructions listing Kubosh Law as the intended ultimate recipient of each Sullo-instructed call.

> Sullo masterminded an attorney-crafted scheme to perpetrate a Fraud on the Court, defined in BLACK'S LAW DICTIONARY and case law as "a lawyer's or party's misconduct so serious that it undermines or is intended to undermine the integrity of the proceeding" such as "bribery of a juror and introduction of fabricated evidence." Sullo surreptitiously recorded every *Carter* Plaintiff's call. Sullo then filed this suit to retaliate against the Kubosh Brothers . . . .

> This Court should dismiss the *Carter* Plaintiffs' claims because not even one "was solicited" by Kubosh Law, to use the passive-tense operative verb in the Civil Barratry Statute. Sullo and [Sullo & Sullo] have conspired with, and have been aided and abetted by their counsel, Zimmerman, and his firm, Zimmerman Axelrad, to barratrously solicit, file, and maintain the *Carter* Plaintiffs, *Youngblood* and *Nash's* frivolous lawsuits to reap undeserved economic benefits where their

perceived pecuniary gain was a significant motivation for the filing and maintenance of these lawsuits.

The Kuboshes' amended counterpetition sought injunctive and declaratory relief, arguing that the civil barratry statute was unconstitutional as applied to them. The Kuboshes also asserted claims for common-law fraud and civil conspiracy against the Carter parties, Andrew Sullo, and Sullo & Sullo, alleging that the Carter parties made their calls to the Kuboshes under false pretenses because they never intended to purchase bonding services from the Kuboshes.

Additionally, the Kuboshes brought claims in this suit against the Carter parties, Andrew Sullo, and Sullo & Sullo for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging that the Carter parties, Andrew Sullo, and Sullo & Sullo formed a criminal enterprise under RICO "to serve as a flexible vehicle for Third-Party Defendants Sullo and [Sullo & Sullo's] filing of a vengeful, Fraud on the Court lawsuits to destroy or degrade Sullo's competitors Michael Kubosh and Paul Kubosh by embroiling them in legally meritless but expensive and time-consuming 'civil barratry' litigation." The Kuboshes alleged violations of RICO as well as conspiracy to violate RICO.

As predicate acts serving as the basis for RICO liability, the Kuboshes alleged that the Carter parties, Sullo, and Sullo & Sullo engaged in mail fraud and wire fraud. The Kuboshes alleged:

12

By sending and receiving courthouse correspondence and service copies of court filings in the U.S. mail, and by using the U.S. mail to communicate with one another in furtherance of their RICO scheme of fraudulently misrepresenting Sullo's efforts to barratrously orchestrate a Fraud on the Court to make money under the guise of conducting "price checks" of the Kubosh Brothers, each of the *Carter* Plaintiffs and Third-Party Defendants Sullo and [Sullo & Sullo] have engaged in mail fraud in violation of 18 U.S.C. § 1341.

By repeatedly using the telephone and by tying up the Kubosh Bonding and Kubosh Law telephone lines to fraudulently misrepresent themselves as ordinary consumers of bail bonding and/or legal services, while concealing such facts as Sullo's presence, Instructions, and interest in carrying out his . . . vendetta against the Kubosh Brothers, each of the *Carter* Plaintiffs and Third-Party Defendants Sullo and [Sullo & Sullo] have engaged in one or more acts of wire fraud in violation of 18 U.S.C. § 1343.

The Kuboshes alleged that each "fraudulent 'price check'" call by the Carter parties "constituted a separate, independent act of wire fraud that together comprise a pattern of racketeering activity."

In April 2015, the judicial panel on multidistrict litigation transferred Nash's and Youngblood's suits—both filed in Jefferson County—to the Harris County district court where Carter's suit was pending for resolution of pretrial matters. *See* TEX. GOV'T CODE ANN. § 74.162 (providing for transfer of "civil actions involving one or more common questions of fact pending in the same or different constitutional courts, county courts at law, probate courts, or district courts to any district court for consolidated or coordinated pretrial proceedings, including summary judgment or

13

other dispositive motions, but not for trial on the merits"). All three suits currently remain pending in the Harris County district court.

Although in the years this litigation has been pending the Carter parties have filed amended petitions in this case, adding factual details, the only cause of action they have asserted against the Kuboshes is a claim for violation of the civil barratry statute.

On April 6, 2016, the Kuboshes filed their fifth amended counterpetition and fourth amended third-party petition. In this petition, the Kuboshes alleged:

> The precise involvement of Zimmerman and [Joe] Fisher in planning and executing the calls is not yet completely known, but we do know from the *Carter* Plaintiffs' Amended Privilege Log that [Andrew] Sullo and Zimmerman were in email communication as early as January 27, 2012 "concerning status of barratry litigation"—a little over two months following the first and most significant spate of calls made from Sullo's office to the Kubosh Defendants. . . . Sullo and Zimmerman began communicating "concerning the status of barratry litigation" almost nine months before Youngblood and Nash made and recorded their calls.

> . . . .

> [T]he Sullo Plaintiffs' privilege log provided to the Kubosh Defendants . . . shows the first discussions to set up this conference room [at Provost Umphrey] were between Andrew Sullo and Brian Zimmerman on July 28, 2012, nearly two months before Mr. Youngblood's call to Kubosh Bail. There can be no reason at all for a discussion to reserve the conference room between the lawyer, Andrew Sullo, who entered into a contract with these Plaintiffs to make a phone call in exchange for a share in the resulting lawsuit, and one future counsel of record, Brian Zimmerman, at the offices of another future counsel of record, Joe Fisher, to which Sullo would have to drive 90 miles to record the call, except to further their criminal enterprise. . . . That is, the wrongfully-withheld e-mails show that the

Provost Umphrey conference room was for nearly three months the center of Sullo's enterprise to target the Kubosh Defendants by launching the first of a pattern of Sullo-orchestrated, Sullo-scripted, and Sullo-recorded sham "Price Match" calls to the Kubosh Defendants.

In addition to the claims asserted in their earlier counterpetition, the Kuboshes added causes of action for violating a federal wiretap statute and Texas's Interception of Communications Act arising out of the recording of the Carter parties' calls to the Kuboshes.

The Kuboshes also added a party to this suit: Gregory Sullo.[1] The Kuboshes "sued G. Sullo in both his individual capacity and as an attorney in and managing partner of [Sullo & Sullo] who foisted this fraud upon the courts of Texas and on the Kubosh Defendants in his supervisory and representative capacity at [Sullo & Sullo]." The Kuboshes alleged that Gregory Sullo was "possibly" present and involved when the Carter parties made their calls to the Kuboshes, and thus committed wire fraud, a predicate act under RICO. The Kuboshes also alleged that Andrew Sullo, Gregory Sullo, and Sullo & Sullo committed the predicate act of obstruction of justice "[b]y formulating a fraudulent scheme using the Sullo fake-plaintiffs fraudulent 'price check' Instructions, actively participating in the

---

[1] In this petition, the Kuboshes also asserted individual claims against Edward James Carney, whose son, Edward Buckley Carney, was one of the Carter parties and who had died prior to the start of litigation. The Kuboshes asserted that, during the pendency of the case, Edward James Carney had fraudulently signed documents on his son's behalf without disclosing that he was acting in a representative capacity for his son's estate.

15

commission of a fraud on this Court, presenting perjurious explanations for his fraudulent 'price check' Instructions and cookie-cutter affidavits, and destroying material parts of the 'price check' record within their sole possession."

Gregory Sullo was not served with this petition naming him as a third-party defendant until November 29, 2017, more than eighteen months after the Kuboshes filed this petition.

## E.     The Kuboshes' Petition for Mandamus Relief

In May 2016, shortly after they filed their fifth amended counterpetition and fourth amended third-party petition, the Kuboshes sought mandamus relief in this Court relating to the trial court's decision not to compel the Carter parties to disclose unredacted copies of a series of emails between Andrew Sullo, Brian Zimmerman, and a paralegal at Provost Umphrey, ranging from July through early October 2012, concerning the reservation of a conference room at the offices of Provost Umphrey in Beaumont so Youngblood and Nash could make their calls to the Kuboshes. The Kuboshes argued that withholding these emails was an improper offensive use of the work product privilege, and a panel of this Court agreed. *See In re Kubosh Bail Bonding*, 522 S.W.3d 75 (Tex. App.—Houston [1st Dist.] 2017, orig. proceeding). This Court reversed the trial court's order denying the Kuboshes' motion to compel and required the Carter parties to disclose the unredacted emails.

16

**F.    The Kuboshes' Amended Counterclaims and Third-Party Claims**

On December 19, 2017, the Kuboshes filed their sixth amended counterpetition and fifth amended third-party petition, raising the same claims as in their previous petition, but adding claims against Brian Zimmerman. They alleged:

> Andrew Sullo framed the "price match" questions to make the Sullo Plaintiffs [the Carter parties] appear as making good faith business inquiries and to disguise Sullo's and Zimmerman's role in orchestrating the calls. Sullo, Zimmerman, Greg Sullo, Sullo & Sullo (collectively, the "Sullo Parties") and the Sullo Plaintiffs conspired to execute a criminal enterprise and pre-planned Fraud on the Court and the Kuboshes.

They further alleged that "[a] key part of the Sullo Plaintiffs' and Sullo Parties' conspiracy and criminal enterprise is to hide behind Texas discovery and evidentiary rules to deliberately obfuscate discovery of the operative facts underlying the lawsuits."

With respect to their RICO claims, the Kuboshes alleged:

> All and each of the Sullo Plaintiffs, the Sullo Parties [including Gregory Sullo and Zimmerman] and Edwards James Carney, and their counsel of record, along with numerous persons who called the Kubosh Defendants under A. Sullo's "price match" instructions but chose not to become plaintiffs in this lawsuit, formed a RICO association-in-fact enterprise with common and continuing purposes, namely, to serve as a flexible vehicle to set up and file these *in terrorem* lawsuits based upon created facts for the express purpose of forcing a settlement, obtaining judgment, and causing the Kubosh Defendants to incur enormous legal fees and to destroy or degrade the Sullo Parties' competitors Michael Kubosh and Paul Kubosh by embroiling them in legally meritless but expensive and time-consuming "civil barratry" litigation. [Sullo & Sullo] and Zimmerman Axelrad are also racketeering enterprises used for these same objectives.

They alleged that the emails that were the subject of the prior mandamus proceeding in this Court constituted RICO predicate acts of wire fraud, as Andrew Sullo and Zimmerman used these emails "to procure 'a Beaumont Plaintiff' with the stated purpose to create fraudulent lawsuits, fraudulently establish venue [in Jefferson County] and fraudulently file and maintain the lawsuits."

The Kuboshes further alleged:

The Sullo Plaintiffs' lawsuits themselves are the goal of and central to the RICO enterprise actively and continuously supported and furthered by the Sullo Plaintiffs, the Sullo Parties and Edward James Carney. In addition to the Sullo Plaintiffs' lawsuits being the goal and ultimate mechanism of the racketeering activities of the RICO enterprise, the Sullo Parties have extended their racketeering activities to fraudulently claim privileges under the Texas rules in order to conceal their actions, offensively employing these privileges as part and parcel of their Fraud on the Court, including Brian Zimmerman filing a sworn declaration that directly contradicts representations as officer of the court of his co-counsel Joe Fisher in apparent perjury and obstruction of justice to maintain the veil of secrecy of his and A. Sullo's participation in the underlying facts of the case and the operative facts themselves.

They alleged that the Sullo Parties—Andrew and Gregory Sullo, Sullo & Sullo, and Brian Zimmerman—used the United States mail as part of their criminal enterprise, including Zimmerman's actions in mailing pleadings and discovery responses and in sending and receiving correspondence to and from the trial court. The Kuboshes also alleged that the Sullo Parties improperly used the trust account held by Zimmerman's law firm, Zimmerman Axelrad, in connection with posting cash bonds

18

for Youngblood and Nash on their warrants to deliberately conceal Andrew Sullo's involvement with the case.

In this petition, the Kuboshes asserted their claims for injunctive and declaratory relief, common-law fraud, civil conspiracy, their RICO claims, and violations of federal and Texas wiretapping statutes against all of the "Sullo Parties," which was defined in their pleadings to include Gregory Sullo and Brian Zimmerman.

## G.      Proceedings Under the Texas Citizens' Participation Act

On January 26, 2018, Zimmerman moved to dismiss all of the claims against him pursuant to the TCPA. Zimmerman argued that the Kuboshes' claims against him were based on, related to, or filed in response to his right to petition, his right of free speech, and his right of association, and, thus, the TCPA applied to the Kuboshes' claims. Specifically, Zimmerman argued that all of the claims against him targeted his actions as counsel for the Carter parties, implicating his right to petition as defined by the TCPA. Zimmerman challenged the Kuboshes' ability to present clear and specific evidence establishing a prima facie case on each element of each cause of action asserted against him. Zimmerman also argued that, even if the Kuboshes could establish a prima facie case, he could establish two defenses to their claims—the attorney-immunity doctrine, which precluded an attorney's liability to nonclients for actions taken within the scope of representing a client, and

19

the applicable statute of limitations—which required the trial court to dismiss the claims against him.

Gregory Sullo also moved for dismissal of all of the claims against him pursuant to the TCPA on January 26, 2018. His motion to dismiss largely mirrored Zimmerman's, although he pointed out that the Kuboshes had alleged no specific actions taken by him, instead "merely lump[ing him] in with allegations against the 'Sullo Parties.'" He argued that no evidence supported any of the Kuboshes' claims against him, contending that his "association with the law firm of Sullo & Sullo and Andrew Sullo alone cannot create a cognizable claim." He asserted that, even if the Kuboshes could establish a prima facie case against him on each of their claims, he could establish that their claims were barred by the statute of limitations, entitling him to dismissal under the TCPA. Both Zimmerman's and Gregory Sullo's TCPA motions to dismiss addressed all of the Kuboshes' causes of action asserted against them: common-law fraud, civil conspiracy, RICO violations, conspiracy to violate RICO, and violations of state and federal wiretapping laws.

On March 29, 2018, the Kuboshes responded to Gregory Sullo's and Zimmerman's motions to dismiss. In addition to arguing that their claims against Sullo and Zimmerman did not implicate any of the statutory rights protected under the TCPA, they also argued that their claims were not subject to the TCPA because

the claims fall within the TCPA's exemption for "commercial speech." The Kuboshes also stated:

> Zimmerman and Greg Sullo have also moved to dismiss claims of wiretapping and common law fraud, which the Kuboshes do not allege against Zimmerman and Greg Sullo. The wiretapping claims are against Andrew Sullo and the Sullo Plaintiffs [the Carter parties], who made and recorded the calls for use for tortious and criminal purposes.

The Kuboshes therefore, in arguing against Sullo's and Zimmerman's TCPA motions, defended only their claims for RICO violations and for conspiracy to violate RICO.[2]

With respect to Gregory Sullo, the Kuboshes argued that his "active participation in this conspiracy to barratrously recruit and fund Kubosh-suing plaintiffs is clear," noting that the Carter parties' amended privilege log references numerous emails sent to Sullo or that he was copied on, "underscor[ing] that Sullo & Sullo was being used as a RICO enterprise—that it was not just Andrew Sullo working in his section, but that he deployed the full resources of his firm." The

---

[2]    At the hearing before the trial court on the TCPA motions, the Kuboshes' counsel stated: "[T]he only claims we have against them [Zimmerman and Gregory Sullo] are the RICO claims and the conspiracy to commit RICO claims. We never brought the—the—the wiretapping claims. They were not abandoned as a result of this motion. They were never brought in the first place. They are—actually, they're rereading the petition to create claims that don't exist for purposes of attacking it by their motion. All we have brought against Greg Sullo and Brian Zimmerman are the RICO and conspiracy to commit RICO."

21

Kuboshes also argued that neither Zimmerman nor Sullo established an affirmative defense to the RICO claims asserted against them.

In addition to responding to Sullo's and Zimmerman's TCPA motions, the Kuboshes moved to dismiss the Carter parties' civil barratry claims against them pursuant to the TCPA. The Kuboshes filed their TCPA motion on March 29, 2018, nearly five years after Youngblood filed the first barratry suit against them. In their motion, the Kuboshes argued that "[t]he underlying speech involved in each Plaintiff call to the Kuboshes, and the Kuboshes' response to their inquiries, involves a 'matter of public concern' under the TCPA definition as an issue related to 'a good, product, or service in the marketplace.'" They further argued that the Carter parties could not establish a prima facie case on each element of their civil barratry claims, asserting that they engaged in no prohibited conduct when the Carter parties called and that the Carter parties could not prove that they were solicited by the Kuboshes.

The Kuboshes further argued that good cause existed to permit the late-filing of their motion to dismiss:

> The Kuboshes have good cause for the late filing of the motion in that any reasonable interpretation of TCPA would inform that it is not available in this case because of the commercial speech exception of the TCPA. If the exception is not found to apply in the cases of Zimmerman's and Greg Sullo's motions to dismiss, it should not apply to the Sullo Plaintiffs' claims against the Kuboshes and the court should hear all the motions to dismiss.

> Good cause further exists because Zimmerman's and Greg Sullo's motions to dismiss would permit these issues to be determined solely

22

from a one-sided perspective and would be inconsistent with the purposes and intent of the TCPA. Filing by Greg Sullo and Brian Zimmerman at this stage of the proceedings compels examination by the Court of all the underlying TCPA issues, and not just those in connection with Brian Zimmerman's and Greg Sullo's motions to dismiss.

After holding a hearing, the trial court denied all three TCPA motions to dismiss. The trial court did not state its rationale in the order denying the motions. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.008(b) (providing that appellate court shall expedite appeal from trial court order on motion to dismiss legal action under TCPA).

## THE TCPA MOTIONS TO DISMISS

The trial court denied Sullo's, Zimmerman's, and the Kuboshes' TCPA motions to dismiss. Each party argues that the trial court erred by making these rulings.

## A.     Standard of Review and Governing Law

The TCPA "protects citizens who [associate,] petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them."[3]

---

[3]     The Texas Legislature amended the TCPA in its most recent legislative session. The amendments are effective September 1, 2019. Because this suit was filed before the effective date of the amendments, it is governed by the statute as it existed before the amendments, and all of our citations and analysis are to the TCPA as it existed prior to September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1– 12, secs. 27.001, 27.003, 27.005, 27.006, 27.009, 27.010, 2019 Tex. Sess. Law Serv. 684, 684–87 (to be codified at TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001– .011).

*Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018) (quoting *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015)); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 ("The purpose of [the TCPA] is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."); *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 433–34 (Tex. 2017) (recognizing that TCPA is designed to balance these dual policies). The TCPA "shall be construed liberally to effectuate its purpose and intent fully." *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.011(b)).

"To effectuate the statute's purpose, the Legislature has provided a two-step procedure to expedite the dismissal of claims brought to intimidate or to silence a defendant's exercise of these First Amendment rights." *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.003); *In re Lipsky*, 460 S.W.3d at 586. For a legal action to be brought "to intimidate or to silence a defendant's exercise of . . . First Amendment rights," *see ExxonMobil*, 512 S.W.3d at 898, and in retaliation for a defendant's exercise of those constitutional rights, the action must be "based on, relate[] to, or is in response to a party's exercise of the right of free speech, right to

petition, or right of association." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a). That party may then file a motion to dismiss the legal action. *Id.*

A TCPA motion to dismiss must be filed not later than the 60th day after the date of service of the legal action, but the trial court may extend the time to file a motion to dismiss on a showing of good cause. *Id.* § 27.003(b); *see id.* § 27.001(6) (defining "legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief").

To obtain dismissal under the TCPA, the moving party must establish, as a threshold matter, that the TCPA properly applies to the legal action against it. *Youngkin*, 546 S.W.3d at 679. Hence, the first step in analyzing a motion to dismiss under the TCPA requires "determining whether the defendant established that the plaintiffs' suit was in response to the defendant's having exercised [his or] her constitutional right to free speech, petition, or association." *S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 846 (Tex. 2018); *Youngkin*, 546 S.W.3d at 680; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b).

The TCPA statutorily defines "exercise of the right of free speech," "exercise of the right to petition," and "exercise of the right of association." The TCPA defines "exercise of the right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests."

TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2). The "exercise of the right of free speech" is defined as "a communication made in connection with a matter of public concern," and a "matter of public concern" is statutorily-defined to include an issue related to (1) health or safety; (2) environmental, economic, or community well-being; (3) the government; (4) a public official or public figure; or (5) a good, product, or service in the marketplace. *Id.* § 27.001(3), (7); *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 892 (Tex. 2018) (noting that TCPA's definition of "exercise of the right of free speech" is "not fully coextensive with" right of free speech protected in United States and Texas Constitutions in that, under TCPA, communication must be "made in connection with a matter of public concern"). The "exercise of the right to petition" is statutorily defined to include, in relevant part, "a communication in or pertaining to . . . a judicial proceeding," and "a communication in connection with an issue under consideration or review by" a judicial body. TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(i), (B). "Communication" itself is defined to include "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1); *Adams*, 547 S.W.3d at 894 (stating that "[a]lmost every imaginable form of communication, in any medium, is covered" under TCPA).

The TCPA expressly states that it does not apply to four different types of legal actions, including an action "brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, . . . or a commercial transaction in which the intended audience is an actual or potential buyer or customer." TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b). The party asserting that a claim is exempt from the TCPA bears the burden of establishing the applicability of the exemption to its suit. *Deaver v. Desai*, 483 S.W.3d 668, 673 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

In determining whether to dismiss a legal action under the TCPA, the court shall consider the "pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a); *Adams*, 547 S.W.3d at 897 ("[T]he unique language of the TCPA directs courts to decide its applicability based on a holistic review of the pleadings.").

If the TCPA movant meets its initial burden to establish the applicability of the TCPA, the burden shifts to the nonmoving party, the party bringing the legal action, to establish by clear and specific evidence a prima facie case for each essential element of the claim in question. *Youngkin*, 546 S.W.3d at 679; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). The TCPA does not define "clear and specific evidence," but the Texas Supreme Court has held that "clear" means

"'unambiguous,' 'sure,' or 'free from doubt'" and "specific" means "'explicit' or 'relating to a particular named thing.'" *S & S Emergency Training Sols.*, 564 S.W.3d at 847 (quoting *In re Lipsky*, 460 S.W.3d at 590). A "prima facie case," as used in the TCPA, means evidence that is legally sufficient to establish a claim as factually true if that evidence is not countered, that is, "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (quoting *In re Lipsky*, 460 S.W.3d at 590); *see In re Lipsky*, 460 S.W.3d at 590–91 (stating that TCPA requires more than mere notice pleading; instead, "a plaintiff must provide enough detail to show the factual basis for its claim").

If the party bringing the legal action establishes a prima facie case on each element of its claim, the burden shifts back to the moving party to establish by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim. *Youngkin*, 546 S.W.3d at 679–80; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d); *ExxonMobil*, 512 S.W.3d at 899 (stating that even if plaintiff establishes prima facie case, court will dismiss underlying action if TCPA movant can establish each element of valid defense by preponderance of evidence).

If the court orders dismissal of a legal action under the TCPA, the court shall award to the moving party (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the action "as justice and equity may require" and (2) sanctions against the party bringing the underlying legal action "as the court

determines sufficient to deter the party who brought the legal action from bringing similar actions described in [the TCPA]." TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a); *D Magazine Partners*, 529 S.W.3d at 442 (holding that, upon dismissal of claims under TCPA, defendant "was therefore entitled to an award of reasonable attorney's fees").

We review a trial court's ruling on a TCPA motion to dismiss de novo. *Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 83 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). We consider the pleadings and the evidence in a light favorable to the nonmovant. *Id.* at 84; *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

## B. Gregory Sullo's and Zimmerman's TCPA Motions to Dismiss the Kuboshes' Claims Against Them[4]

### 1. The Kuboshes' RICO Claims

In their amended counterpetition and third-party petition, the Kuboshes sued Gregory Sullo and Zimmerman for allegedly "barratrously solicit[ing], fili[ing], and maintain[ing] the [Carter parties'] frivolous lawsuits to reap underserved economic benefits where their perceived pecuniary gain was a significant motivation for the filing and maintenance of these lawsuits" in violation of the Texas criminal barratry

---

[4] Sullo and Zimmerman moved to dismiss all of the claims against them pursuant to the TCPA. In their response, the Kuboshes addressed only their RICO claims and asserted that they had not brought any other claims against Sullo and Zimmerman.

statute, Penal Code section 38.12, Texas Rule of Disciplinary Procedure 7.03, and the RICO mail and wire fraud statutes.

The Kuboshes alleged that Gregory Sullo and Zimmerman, in addition to Andrew Sullo and the Carter parties, "conspired to engage in and then did engage in mail fraud, wire fraud, violation of federal wiretap law, and perjury that furthered the RICO Enterprise's unlawful purposes, as set forth above."

Specifically, the Kuboshes alleged:

- "All and each of the Sullo Plaintiffs [and] the Sullo Parties [defined to include Gregory Sullo and Zimmerman] . . . formed a RICO association-in-fact enterprise with common and continuing purposes, namely, to serve as a flexible vehicle to set up and file these *in terrorem* lawsuits based upon created facts for the express purpose of forcing a settlement, obtaining judgment, and causing the Kubosh Defendants to incur enormous legal fees and to destroy or degrade the Sullo Parties' competitors Michael Kubosh and Paul Kubosh by embroiling them in legally meritless but expensive and time-consuming 'civil barratry' litigation."

- "Predicate acts of wire fraud are set out in detail in the very Emails between A. Sullo and Brian Zimmerman who used the emails to procure 'a Beaumont Plaintiff' with the stated purpose to create fraudulent lawsuits, fraudulently establish venue and fraudulently file and maintain the lawsuits."

- "In addition to the Sullo Plaintiffs' lawsuits being the goal and ultimate mechanism of the racketeering activities of the RICO enterprise, the Sullo Parties have extended their racketeering activities to fraudulently claim privileges under the Texas rules in order to conceal their actions, offensively employing these privileges as part and parcel of their Fraud on the Court, including Brian Zimmerman filing a sworn declaration that directly contradicts representations as officer of the court of his

30

co-counsel Joe Fisher in apparent perjury and obstruction of justice to maintain the veil of secrecy of his and A. Sullo's participation in the underlying facts of the case and the operative facts themselves."

- "A. Sullo's and Brian Zimmerman's testimony and filings in this case have been tailored to address whatever inquiry into the facts they seek to obstruct or substantive ruling they seek to foreclose. Their actions have been taken with no legitimate purpose and only to conceal the truth and to increase the burden and expense to the Kubosh Defendants by making the defense of the lawsuits so prohibitively expensive as to force a settlement, and to obtain judgment on fraudulent premises."

- "These patently frivolous positions and offensive use of work product and attorney-client privilege are racketeering activities of their criminal enterprise, as recognized by the First Court of Appeals [referring to this Court's prior decision in *In re Kubosh Bail Bonding*], and are targeted to make the litigation prohibitively expensive, prevent the discovery of the truth, force settlement and obtain a judgment."

- "The Sullo Parties' . . . racketeering enterprise affects interstate commerce because it uses the instrumentalities of interstate commerce to tie up at least three Texas civil courts in two different counties."

- "[T]he Sullo Parties . . . have used the U.S. mail, an instrumentality of interstate commerce, as part of their RICO enterprise, including Zimmerman's certified mailing of Fraud on the Court pleadings and discovery responses in *Carter*, *Youngblood* and *Nash* as instances of using the U.S. Postal Service."

- "[T]he Sullo Parties used accounts at banks to screen A. Sullo's participation in the underlying lawsuits, specifically use of Zimmerman Axelrad's trust account to conceal that A. Sullo was actually counsel for Youngblood and Nash for their traffic warrant cases and that Zimmerman was actively conspiring to conceal the truth regarding their barratrous orchestration of all of the Sullo Plaintiffs' claims."

- "[T]he Sullo Parties used e-mail, an instrumentality of interstate commerce, to the Kubosh Defendants and emails between the Sullo Parties, specifically including the Emails between A. Sullo and Brian Zimmerman to procure a 'Beaumont Plaintiff' to fraudulently anchor venue in Beaumont for the *Youngblood* and *Nash* cases."

- "By sending and receiving courthouse correspondence and service copies of court filings in the U.S. mail, and by using the U.S. mail to communicate with one another in furtherance of their RICO scheme of fraudulently misrepresenting the Sullo Parties' efforts to barratrously orchestrate a Fraud on the Court to make money under the guise of conducting 'price checks' of the Kubosh Defendants, each of the Sullo Plaintiffs, the Sullo Parties and Edward James Carney have engaged in mail fraud . . . ."

- "Brian Zimmerman's actions in setting up the conference room at Provost Umphrey for A. Sullo to procure Beaumont Plaintiffs Youngblood and Nash's fake 'price match' calls were followed up by his handling of the cash bonds to conceal A. Sullo's participation and Brian Zimmerman's orchestration of these claims and manufacturing of the case facts with A. Sullo and attorneys in his own firm. The ongoing litigation, as found by the First Court of Appeals, is part of the continuing racketeering activity, and use of the mails and electronic systems employed by the courts are fundamental in carrying them out."

- "By formulating a fraudulent scheme using the Sullo fake-plaintiffs fraudulent 'price check' instructions, actively participating in the commission of a fraud on this Court, presenting perjurious explanations for his fraudulent 'price check' instructions and cookie-cutter affidavits, and destroying material parts of the 'price check' record within their sole possession, Third-Party Defendants A. Sullo, G. Sullo, [and] Brian Zimmerman . . . have engaged in obstruction of justice . . . ."

In their response to Sullo's TCPA motion to dismiss, the Kuboshes argued:

Greg Sullo's active participation in this conspiracy to barratrously recruit and fund Kubosh-suing plaintiffs is clear. He is a co-owner of Sullo & Sullo, the firm that was operated as a criminal enterprise to turn their clients into plaintiffs in a critical mass of manufactured claims. Greg Sullo is copied on many pieces of email correspondence, as early as February 28, 2012 and including several where both Greg Sullo and Ms. Shivers [an attorney at Zimmerman Axelrad, and who posted the bond for Youngblood and Nash] were copied, on November 1 and 11, 2013 and again on December 16, 2013. In addition, the amended privilege log references emails to which Greg Sullo is a party. Greg Sullo's involvement underscores that Sullo & Sullo was being used as a RICO enterprise—that it was not just Andrew Sullo working in his section, but that he deployed the full resources of his firm.

The Kuboshes also argued that "abundant evidence" exists to support an inference that Sullo agreed to commit two more racketeering acts,

including Greg Sullo's partnership in the criminal enterprise of Sullo & Sullo and the evidence of his involvement in the planning and execution by his presence on the supposedly work product privileged emails to which he was a party. Greg Sullo was also part of the so-called "legal strategy" to barratrously solicit clients to sue the Kuboshes.

With respect to Zimmerman, it is undisputed that the majority of the Carter parties' phone calls to the Kuboshes occurred in September and October 2011, with the parties immediately signing attorney-client representation agreements with Andrew Sullo. It is also undisputed that Andrew Sullo first contacted Zimmerman about the cases in January 2012 and that Zimmerman accepted referral of the cases in May or June 2012 and undertook their representation.

With respect to the basis of their RICO claims, the Kuboshes alleged that Zimmerman, along with others, "formed a RICO association-in-fact enterprise with

33

common and continuing purposes, namely, to serve as a flexible vehicle to set up and file these *in terrorem* [civil barratry] lawsuits based upon created facts." The Kuboshes alleged that Zimmerman committed a RICO predicate act of wire fraud by exchanging emails with Andrew Sullo beginning in July 2012 "to procure 'a Beaumont Plaintiff' with the stated purpose to create fraudulent lawsuits, fraudulently establish venue and fraudulently file and maintain the lawsuits."

**2. *Sullo and Zimmerman's Initial Burden as TCPA Movants to Show the Applicability of the TCPA to the Kuboshes' RICO Claims Against Them***

In moving to dismiss the Kuboshes' RICO claims against them under the TCPA, Sullo and Zimmerman bore the initial burden of showing by a preponderance of the evidence that the TCPA applies to the claims asserted against them and that no exemption from TCPA coverage applies. In this case, they were required to show that the conduct for which they were sued were "communication[s] made in connection with a matter of public concern," which, in the context of this case, necessarily means communications related to a "service in the marketplace"—here the provision of legal services by Sullo and Zimmerman—and that those communications were protected. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7); *Adams,* 547 S.W.3d at 892.

**a. *Whether the Kuboshes' suit against Sullo and Zimmerman is brought in relation to a matter of public concern***

34

Both the barratry claims that the Sullo firm and Zimmerman have brought and maintained against the Kuboshes on behalf of the Carter parties and the RICO claims that the Kuboshes have brought against Sullo and Zimmerman for filing and maintaining the Carter parties' barratry suits against the Kuboshes arise out of a matter of public concern—the allegedly barratrous sale of legal services. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7); *cf. DeAngelis v. Protective Parents Coalition*, 556 S.W.3d 836, 852 (Tex. App.—Fort Worth 2018, no pet.) ("[P]ublic or private communications related to the provision of legal services to the public by licensed attorneys . . . are recognized as matters of 'public concern' implicating the exercise of free speech under the TCPA."); *Deaver*, 483 S.W.3d at 673–74 (holding that statements that attorney is prejudiced and will lie to win case relate to attorney's legal services, which are offered in marketplace, and thus statements address matters of public concern). Accordingly, this Court must determine in this TCPA suit whether Sullo and Zimmerman have shown by a preponderance of the evidence that the actions for which the Kuboshes have sued them are constitutionally protected communications in relation to their provision of legal services to their clients and are not, as the Kuboshes allege, actions that are not constitutionally protected but are, instead, actionable in themselves as communications prohibited by law.

We note as a threshold matter that the violations of the *criminal* barratry statute, Penal Code section 38.12, alleged by the Kuboshes as RICO predicate acts

35

against the defendants, including Sullo and Zimmerman, in the underlying suit are not the same as the violations of the *civil* barratry claims brought against the Kuboshes by the Carter parties under sections (c), (d), and (e) of the then-newly-enacted Texas civil barratry statute, Government Code section 82.0651. Under the plain language of section 82.0651, each of the civil barratry actions brought by the Carter parties against the Kuboshes could only have been brought by a person "solicited by conduct [of the Kuboshes] violating Section 38.12(a) or (b), Penal Code, or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct." *See* TEX. GOV'T CODE ANN. § 82.0651(c). And, in addition, these civil barratry claims could have been brought and maintained on behalf of the Carter parties by the Sullo firm and Zimmerman only if the Carter parties did *not* subsequently "enter into a contract [with the alleged offender, the Kuboshes] as a result of [the Kuboshes'] conduct" in improperly soliciting their business. *Id.* The Carter parties did not enter into contracts with the Kuboshes for legal or bail bond services. Therefore, the civil barratry statute applies to the Kuboshes' allegedly barratrous actions.

Conversely, the Kuboshes' RICO claim against Sullo and Zimmerman is based on Sullo and Zimmerman and the other defendants' actions in allegedly manufacturing the barratry claims brought by the Carter parties against the Kuboshes after soliciting the Carter parties to create them, and then representing the Carter parties in pursuing those claims in the solicited litigation. These actions are all

36

represented by the Kuboshes as acts of *criminal* barratry in violation of Penal Code section 38.12(a) and (b) and, because of the use of phones and other electronic communications in soliciting and maintaining allegedly barratrous litigation, as RICO predicate acts.

> b. *Whether the TCPA movants have shown that their actions, represented by the Kuboshes as RICO predicate acts, are protected communications*

In their amended counterpetition and third-party petition, the Kuboshes accuse Sullo, Zimmerman, and the other defendants of violating Penal Code section 38.12, the criminal barratry statute, which prohibits offering "to pay [or] give . . . to a prospective client money or anything of value to obtain employment as a professional from the prospective client" and "knowingly accept[ing] employment within the scope of the person's license, registration, or certification that results from the solicitation of employment in violation of Subsection (a)" of section 38.12. *See* TEX. PENAL CODE ANN. § 38.12(a)(3), (b)(3). Specifically, the Kuboshes allege that, through Andrew Sullo's price match program, the defendants offered to give the Carter parties something of value—an interest in recovering damages from the Kuboshes in a civil lawsuit—in order to obtain employment by the Carter parties.

The Kuboshes contend that both the TCPA movants' solicitation of the Carter parties as prospective clients and their representation of them in barratry litigation against the Kuboshes by use of the telephone and electronic communications are *not*

constitutionally protected acts of free speech and of the right to petition, but are instead illegal acts of mail fraud and wire fraud in violation of both the Texas Penal Code and RICO, and, thus, are RICO predicate acts that are *not* protected by the TCPA. To carry their initial burden in their TCPA motion, therefore, Sullo and Zimmerman were required to show by a preponderance of the evidence that they were sued solely for actions taken within "the scope of their representation of" the Carter parties and *not* for conduct outside the scope of that legal representation or for "conduct foreign to the duties of a lawyer," namely barratrous activities of their own. *See Youngkin*, 546 S.W.3d at 681.

Zimmerman argues in support of his TCPA motion that all of the alleged actions that form the basis of the Kuboshes' RICO claims against him were taken in his capacity as counsel for the Carter parties and are, therefore, within the scope of his representation of his clients and are constitutionally protected acts to which the TCPA applies. *See Youngkin*, 546 S.W.3d at 681 (setting out affirmative defense of attorney immunity); *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (same); *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 406 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("[A]n attorney's conduct, even if frivolous or without merit, is not independently actionable if the conduct is part of the discharge of the lawyer's duties in representing his or her client."). Zimmerman claims that, even though the Kuboshes repeatedly label as "wrongful" and

38

"fraudulent" his alleged actions that serve as the basis for the Kuboshes' RICO claims against him—consulting with referring counsel, filing pleadings and discovery responses, asserting privileges, and using trust accounts to post bonds for clients—these acts are "the kind of conduct in which an attorney engages when discharging his duties to his client." *See Cantey Hanger*, 467 S.W.3d at 482; *see also Youngkin*, 546 S.W.3d at 681 (noting that focus of inquiry is "on the *kind* of conduct at issue rather than the *alleged wrongfulness* of said conduct").

Zimmerman also argues that his conduct in sending the emails relating to securing the Provost Umphrey conference room for Youngblood and Nash to make their calls to the Kuboshes is protected by attorney immunity even though these actions occurred before any of the Carter parties filed suit and thus occurred outside the litigation context. *See Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501, 505–06 (5th Cir. 2019) (examining case law from Texas intermediate appellate courts applying doctrine of attorney immunity outside of litigation context, concluding that this application comports with purpose of doctrine to "promote loyal, faithful, and aggressive representation" in comprehensive manner, and holding that Texas Supreme Court would apply attorney immunity doctrine to conduct occurring in non-litigation context).

In their TCPA motion in response to the Kuboshes' RICO suit against them, Sullo and Zimmerman allege that Zimmerman's filing of the barratry lawsuits

39

against the Kuboshes on behalf of the Carter parties, his filing of amended petitions and discovery responses, his assertion of privilege, and his communications with Andrew Sullo and Gregory Sullo concerning the maintenance and status of the barratry lawsuits—actions central to the Kuboshes' RICO claims, as indicated in the Kuboshes' pleadings—are all actions that they took in connection with the Carter parties' lawsuits against the Kuboshes and are therefore acts of free speech, association, and the right to petition that are protected by the TCPA. *See Hawxhurst v. Austin's Boat Tours*, 550 S.W.3d 220, 227 (Tex. App.—Austin 2018, no pet.) (holding that "broad definition" of "communication" under TCPA "encompasses a petition in a lawsuit, which is a 'judicial proceeding'").

In support of their TCPA motion to dismiss the Kuboshes' claims against them, Sullo and Zimmerman observe that Texas Supreme Court has held that the TCPA "applies to a legal action against a party that is based on, related to, or in response to the party's making or submitting of a statement or document in or pertaining to a judicial proceeding." *See Youngkin*, 546 S.W.3d at 680; *see also Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) ("The basis of a legal action is not determined by the defendant's admissions or denials but by the plaintiff's allegations. . . . When it is clear from the plaintiff's pleadings that the action is covered by the [TCPA], the defendant need show no more.").

Sullo and Zimmerman further point out that an attorney is immune from liability to nonclients for conduct within the scope of his representation of his clients. *Youngkin*, 546 S.W.3d at 681; *Cantey Hanger*, 467 S.W.3d at 481 (stating that defense of attorney immunity stems from "the broad declaration over a century ago that 'attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages'") (quoting *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. App.—Dallas 1910, writ ref'd)). Furthermore, they argue, the Texas Supreme Court has held:

> Put differently, an attorney may be liable to nonclients only for conduct outside the scope of his representation of his client or for conduct foreign to the duties of a lawyer. We also clarified in Cantey Hanger that the above inquiry correctly focuses on the kind of conduct at issue rather than the alleged wrongfulness of said conduct. That is, a lawyer is no more susceptible to liability for a given action merely because it is alleged to be fraudulent or otherwise wrongful.

*Youngkin*, 546 S.W.3d at 681; *see Cantey Hanger*, 467 S.W.3d at 481 ("Even conduct that is 'wrongful in the context of the underlying suit' is not actionable if it is 'part of the discharge of the lawyer's duties in representing his or her client.'") (quoting *Toles v. Toles*, 113 S.W.3d 899, 910–11 (Tex. App.—Dallas 2003, no pet.)). They also argue that labeling an attorney's conduct as fraudulent "does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney.'" *Cantey Hanger*, 467 S.W.3d at 483 (quoting *Alpert*, 178 S.W.3d at 406). The attorney-immunity defense "exists to promote 'loyal,

41

faithful, and aggressive representation' by attorneys, which it achieves, essentially, by removing the fear of personal liability." *Youngkin*, 546 S.W.3d at 682 (quoting *Cantey Hanger*, 467 S.W.3d at 481).

Sullo and Zimmerman thus argue that they have demonstrated by a preponderance of the evidence that the TCPA applies to the RICO claims asserted against them. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a) (providing that party may move to dismiss legal action against him if legal action is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association"); *Youngkin*, 546 S.W.3d at 680–81 (holding that TCPA applied to nonclient's claims against attorney because attorney's alleged liability "stem[med] from his dictation of the Rule 11 agreement into the court record during trial," attorney's statement was made in judicial proceeding, and claim thus implicated attorney's right to petition); *James v. Calkins*, 446 S.W.3d 135, 147–48 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding that TCPA applied to plaintiff's fraud and barratry claims against defendant and her attorneys because claims were based on defendant and attorneys' assertion that they represented ward in pleadings filed in lawsuits and plaintiff's fraudulent lien claim was based on lis pendens defendant had filed in another proceeding); *see also River Plantation Cmty. Improvement Ass'n v. River Plantation Props., LLC*, No. 09-17-00451-CV, 2018 WL 4120252, at *4 (Tex. App.—Beaumont Aug. 30, 2018, no pet.) (mem. op.)

("The TCPA creates a safeguard to protect individuals who are in litigation from retaliation based on the individual's filing of a petition with a court.").

We conclude that Sullo and Zimmerman have failed to bear their burden of showing by a preponderance of the evidence that the communications for which they were sued were lawful acts of legal representation protected by the First Amendment as opposed to unlawful acts of criminal barratry, mail fraud, and wire fraud. Moreover, as we discuss below, we conclude that the Kuboshes have established a prima facie case on each essential element of their RICO claims against these defendants and that Sullo and Zimmerman have failed to establish each essential element of a valid defense to the Kuboshes' RICO claims against them. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c), (d) (providing that if TCPA movant meets its initial burden to establish applicability of TCPA, burden shifts to nonmoving party—party bringing underlying legal action—to establish by clear and specific evidence prima facie case against TCPA movant for each essential element of claim in question and that, if nonmoving party does so, burden shifts back to movant to establish each essential element of valid defense to nonmoving party's claims); *Youngkin*, 546 S.W.3d at 679–80.

### 3. *The Kuboshes' Burden as TCPA Non-Movants to Make a Prima Facie Case Against Sullo and Zimmerman*

To establish a prima facie case for their RICO claims against Sullo and Zimmerman, the Kuboshes were required to produce evidence legally sufficient to

43

establish these claims as factually true if not countered; that is, they were required to support their RICO claims with "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *S & S Emergency Training Sols.*, 564 S.W.3d at 847 (quoting *In re Lipsky*, 460 S.W.3d at 590). If the party bringing the underlying action establishes a prima facie case on each element of its claim against the TCPA movant, the burden shifts back to the movant to establish by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim. *Youngkin*, 546 S.W.3d at 679–80; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d); *ExxonMobil*, 512 S.W.3d at 899.

The Kuboshes alleged that Sullo and Zimmerman violated the following provision of RICO:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The different subsections of section 1962 have three common elements that a plaintiff must demonstrate to establish civil RICO liability: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 523–24 (5th Cir. 2016); *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007). "A pattern of racketeering activity consists of two

44

or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *Snow Ingredients*, 833 F.3d at 524 (quoting *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (per curiam)); *Abraham*, 480 F.3d at 355. The predicate criminal acts can be violations of either state or federal law. *Snow Ingredients*, 833 F.3d at 524. "An enterprise is a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003).

The Kuboshes also alleged that Sullo and Zimmerman—along with Andrew Sullo, Sullo & Sullo, and the Carter parties—conspired to violate section 1962(c). RICO "criminalizes conspiracy to violate any of its substantive provisions." *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005); *see* 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), (c) of this section."). To prove a RICO conspiracy, the plaintiff must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense. *Delgado*, 401 F.3d at 296. Under section 1962(d), there is no requirement that the conspirator "have committed or agreed to commit the two predicate acts"; instead, the conspirator "need only have known of and agreed to the overall objective of the RICO offense." *Id.*

Section 1961 defines "racketeering activity" and lists a number of criminal offenses that can constitute racketeering activity, including mail fraud and wire fraud. *See* 18 U.S.C. § 1961(1)(B). The United States Code defines mail fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. . . .

*Id.* § 1341; *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009) ("The mail fraud statute applies to anyone who 'knowingly causes to be delivered by mail' anything 'for the purpose of executing' 'any scheme or artifice to defraud.'") (citation omitted). The United States Code defines wire fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures,

or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343; *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009) ("Wire fraud is a specific-intent crime requiring proof that the 'defendant knew the scheme involved false representations,' which related to material information.") (quoting *United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007)).

The Texas Supreme Court has consistently pointed out that while attorney immunity is broad, "it is not limitless." *Youngkin*, 546 S.W.3d at 682. Attorneys are not "insulated from all liability to nonclients for all wrongdoing in the name of a client." *Id.* Specifically, attorneys are not shielded from liability to nonclients for their actions when those actions "do not qualify as 'the kind of conduct in which an attorney engages when discharging his duties to his client.'" *Cantey Hanger*, 467 S.W.3d at 482.

The court has identified "several nonexhaustive examples of conduct that may fall outside the reach of the attorney-immunity defense," including the attorney's participating in a fraudulent business scheme with a client, knowingly assisting a client with a fraudulent transfer to avoid paying a judgment, stealing of goods or services on the client's behalf, and assaulting opposing counsel during trial. *Youngkin*, 546 S.W.3d at 682–83; *Cantey Hanger*, 467 S.W.3d at 482–83. Finally, the supreme court has specified that while "[f]raud is not an exception to attorney-immunity," the attorney-immunity defense "does not extend to fraudulent conduct

47

that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation." *Cantey Hanger*, 467 S.W.3d at 484; *see also Troice*, 921 F.3d at 507 ("We conclude that criminal conduct [by an attorney] does not automatically negate immunity, but in the usual case it will be outside the scope of representation.").

Thus, the focus of the inquiry into whether the attorney-immunity defense applies is on "the type of conduct at issue and the existence of an attorney-client relationship at the time." *Youngkin*, 546 S.W.3d at 683; *see also Troice*, 921 F.3d at 506 ("When Texas courts address criminal behavior in the immunity analysis . . . their framework remains whether that behavior was in the scope of representation and not whether it was criminal.").

Unlike those cases in which an attorney's actions alleged to be within the scope of the TCPA were held to be constitutionally protected activities, the Kuboshes alleged that Sullo and Zimmerman either took actions outside the scope of representation of their existing clients in furtherance of an illegal scheme "to pay[], give[], or advance[] . . . to a prospective client money or [some]thing of value to obtain employment as a professional from the prospective client" or "knowingly accept[ed] employment within the scope of [their] license, registration, or certification that result[ed] from the solicitation of employment in violation of [Penal Code] Subsection [38.12](a)." *See* TEX. PENAL CODE ANN. § 38.12(a)(3), (b)(3).

48

The Kuboshes pleaded their claims against Sullo and Zimmerman clearly and specifically and supported them by evidence of the actions taken, which they allege were unlawful. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.005(c) (setting out prima facie case requirement), 27.006(a) (requiring court, in determining whether to dismiss legal action under TCPA, to consider "pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based"). Specifically, the Kuboshes produced evidence showing that none of the Carter parties' suits were filed until after each individual plaintiff had agreed in writing to participate in the price match program and to call Kubosh Bail Bonding expecting that they would likely be transferred to the Kubosh Law Office. The record includes evidence of the "Disclosure & Agreement" forms setting out the price match program that each of the Carter parties signed before calling the Kuboshes, instruction sheets informing the Carter parties what to ask during their calls, form affidavits completed by each of the Carter parties after their calls, and attorney-client agreements signed by each of the Carter parties and Andrew Sullo. The record also includes evidence—in the form of emails—that Zimmerman was involved in setting up the conference room in Beaumont where Youngblood and Nash called the Kuboshes and evidence that Gregory Sullo participated in email exchanges concerning the suits against the Kuboshes.

49

Thus, the Kuboshes pleaded that Sullo and Zimmerman committed violations of law that clearly and specifically bring their actions within the scope of the criminal barratry statute, Penal Code section 38.12, Rule 7.03 of the Disciplinary Rules of Professional Conduct, and 18 U.S.C. sections 1341 and 1343, prohibiting mail and wire fraud, predicate acts under RICO. *See, e.g.*, *Whitfield*, 590 F.3d at 354 ("The mail fraud statute applies to anyone who 'knowingly causes to be delivered by mail' anything 'for the purpose of executing' 'any scheme or artifice to defraud.'"); *Stalnaker*, 571 F.3d at 436 ("Wire fraud is a specific-intent crime requiring proof that the 'defendant knew the scheme involved false representations,' which related to material information.") (citation omitted); *see also Snow Ingredients*, 833 F.3d at 523–24 (holding that necessary element of civil RICO claim is "pattern of racketeering activity," which consists of "two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity," and that predicate criminal acts can be violations of state or federal law). And they supported their claims with evidence stating the facts on which their RICO claims are based. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.005(c), 27.006(a).

Accordingly, we hold that the Kuboshes established a prima facie case against Sullo and Zimmerman by "clear and specific evidence," satisfying their burden of proof necessary to avoid dismissal under the TCPA. *See S & S Emergency Training Sols.*, 564 S.W.3d at 847; *In re Lipsky*, 460 S.W.3d at 590–91. That is, they

referenced evidence that is legally sufficient to establish their claims as factually true if not countered. *See S & S Emergency Training Sols.*, 564 S.W.3d at 847; *In re Lipsky*, 460 S.W.3d at 590.

### 4. *Sullo and Zimmerman's Limitations Defense to the Kuboshes' RICO Claims*

Because the Kuboshes established a prima facie case on each element of the underlying RICO claims upon which Sullo and Zimmerman sought dismissal, the burden shifted back to Sullo and Zimmerman to establish by a preponderance of the evidence each essential element of a valid defense to the RICO claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d); *Youngkin*, 546 S.W.3d at 679–80; *ExxonMobil*, 512 S.W.3d at 899. We look to the "pleadings and supporting and opposing affidavits stating the facts on which the . . . defense is based," *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a), and we conduct "a holistic review of the pleadings." *Adams*, 547 S.W.3d at 897.

Here, Sullo and Zimmerman argue that the Kuboshes' RICO claims against them should be dismissed because the statute of limitations expired before the claims were brought against them, providing a complete defense to those claims. The Kuboshes respond that their evidence of Sullo's and Zimmerman's actions that form the basis of the RICO claims against these defendants was obtained only after this Court ordered the release of previously withheld emails on May 16, 2017.

A RICO plaintiff must bring his claims within four years of discovering the harm. *Rotella v. Wood*, 528 U.S. 549, 553–54 (2000). Under the "injury discovery rule," the Fifth Circuit has held that "a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury." *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 773 (5th Cir. 2000). The Fifth Circuit has also adopted the "separate accrual rule," which, when a pattern of RICO activity causes a continuing series of separate injuries, allows a civil RICO claim to accrue for each injury when the plaintiff discovers or should have discovered that injury. *Id.* at 773–75. And it has expressly rejected the "fraud discovery rule," under which a RICO cause of action accrues when the plaintiff becomes aware of a fraud; it has held, instead, that a RICO cause of action against a defendant does not accrue under the injury-discovery rule until the plaintiff knows or should have known "that it suffered an injury caused by that allegedly fraudulent conduct." *Id.* at 777. Moreover, under the doctrine of fraudulent concealment, the limitations period for a RICO claim is tolled until the plaintiff discovers, or with reasonable diligence should have discovered, the concealed fraud. *Id.* at 779 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 184 (1997)). All of these doctrines—the discovery rule, the accrual rule, and the fraudulent concealment rule—apply in this case.

The Kuboshes contend that they did not realize until the filing of the Nash petition in October 2014 that third-party defendant Andrew Sullo had concealed a

52

reserve of recordings to use against the Kuboshes in the Carter parties' suit against them and that only then did they realize the nature of the RICO injury they had suffered. The emails show the nature of Zimmerman's involvement, and the filing of the Nash petition revealed that there were recordings of the phone calls that the Kuboshes alleged constituted RICO predicate acts. The Kuboshes further argue that only through the privilege log produced in this case did they discover that Gregory Sullo was involved in the planning and execution of the "price match scheme," which the Kuboshes allege is unlawful under RICO. They contend that the third-party defendants actively worked to conceal the facts pertinent to their RICO injury and that they required court intervention to secure the evidence needed to establish the allegedly unlawful scheme.

We conclude that Sullo and Zimmerman have failed to establish their limitations defense by a preponderance of the evidence. Accordingly, we hold that they are not entitled to dismissal of the Kuboshes' RICO claims against them on limitations grounds.

We hold that the Kuboshes' suit under RICO is not subject to dismissal under the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003, 27.005; *see also id.* § 27.002 ("The purpose of [the TCPA] is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and,

at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."). Therefore, the trial court did not err by denying Sullo's and Zimmerman's motions to dismiss the Kuboshes' RICO claims against them under the TCPA.[5]

We overrule Sullo's and Zimmerman's first issue.[6]

---

[5] The Kuboshes also argue that their RICO claims against Sullo and Zimmerman fall within the commercial speech exemption and, therefore, the TCPA is not applicable to their claims. The TCPA expressly provides that, even if the plaintiff's claim is based on, related to, or in response to the defendant's exercise of his right of freedom of speech, right to petition, or right of association, the Act does not apply to certain situations. One of these situations to which the TCPA does not apply is a legal action "brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services . . . or a commercial transaction in which the intended audience is an actual or potential buyer or customer," known as the commercial speech exemption. TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b). We find it unnecessary to reach this argument.

[6] Sullo and Zimmerman also seek their attorney's fees and costs pursuant to section 27.009(a) of the TCPA. Under the TCPA, if the court orders dismissal of a legal action, the court shall award to the moving party (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require, and (2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party from bringing similar actions described in the TCPA. TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a); *Youngkin v. Hines*, 546 S.W.3d 675, 683 (Tex. 2018); *see Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016) (holding that TCPA requires award of "reasonable attorney's fees" to successful movant and stating that "reasonable" attorney's fee is "one that is not excessive or extreme, but rather moderate or fair"). Because we affirm the trial court's order denying Sullo and Zimmermans' motions to dismiss the Kuboshes' claims against them under the TCPA, we overrule their issue seeking attorney's fees and expenses as they are not a prevailing party on their motions.

**C.    The Kuboshes' Motion to Dismiss the Carter Parties' Claims Against Them**

*1.    The Kuboshes' First Amendment Claim Challenging the Constitutionality of Government Code Section 82.0651*

In the underlying litigation, the Kuboshes have asserted a First Amendment claim challenging the constitutionality of Government Code section 82.0651 as applied in the Carter parties' suits.

Recognizing the public importance to the State of Texas of the construction and application of the barratry laws, especially then-recently-enacted section 82.0651, as a matter of public concern, the State intervened as of right in this litigation. It filed a brief in this appeal in which it states the following:

> This litigation has been pending, in various forms and with various parties, since 2013. But, crucially, *the district court has not yet decided the fundamental issue in the case*: whether lawyer Paul Kubosh/Kubosh Law Office and bail bondsman Felix Michael Kubosh/Kubosh Bonding (the Kuboshes) violated the Texas civil barratry statute, TEX. GOV'T CODE § 82.0651(c). *Until the district court has made that determination, there cannot and should not be a resolution of the Kuboshes' as-applied First Amendment challenge. . . .* The Court should decline the Kuboshes' invitation to reach the constitutionality of the Texas civil barratry statute.

(Emphasis added.)

We agree with the State's observation that "the district court has not yet decided the fundamental issue in the case"—whether the Kuboshes violated the civil barratry statute, Government Code section 82.0651—and therefore that the Kuboshes' as-applied First Amendment challenge should not be resolved at this

55

time. We further observe that, as stated above, the district court has also not yet decided whether the challenged actions of Sullo, Zimmerman, and the other defendants in the Kuboshes' RICO suit are lawful acts of representation of clients or unlawful acts that violated the criminal barratry statute, section 38.12 of the Penal Code. And from that observation we draw the reasonable inference that it is just as premature for us to decide in this TCPA action whether the TCPA movants, Sullo and Zimmerman, were exercising their First Amendment rights to practice the legal profession in representing their clients in the barratry suits against the Kuboshes, or were participating in an illegal scheme to enrich themselves by soliciting clients to manufacture civil barratry claims for their own pecuniary gain and then representing those persons as plaintiffs in their barratry suits against the Kuboshes.

### 2. *Analysis of the Kuboshes' TCPA Cross-Motion*

We turn now to the merits of the Kuboshes' cross-motion to dismiss the Carter parties' civil barratry claims against them pursuant to the TCPA. We first address whether the Kuboshes' TCPA motion was timely.

This Court has held that "[i]t is well-settled that the purpose of the TCPA is 'to allow a defendant *early in the lawsuit* to dismiss claims that seek to inhibit a defendant's constitutional rights to petition, speak freely, associate freely, and participate in government as permitted by law.'" *Jordan v. Hall*, 510 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting *Paulsen v. Yarrell*, 455

56

S.W.3d 192, 197 (Tex. App.—Houston [1st Dist.] 2014, no pet.)); *see Miller Weisbrod, L.L.P. v. Llamas-Soforo*, 511 S.W.3d 181, 193 (Tex. App.—El Paso 2014, no pet.) (stating that Legislature intended to effectuate purpose of TCPA "by ensuring that courts will dismiss SLAPP suits quickly and without the need for prolonged and costly proceedings"). Civil Practice and Remedies Code section 27.003 provides that a TCPA motion to dismiss must be filed "not later than the 60th day after the date of service of the legal action." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b); *Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 885 (Tex. App.—Austin 2018, pet. denied); *Bacharach v. Garcia*, 485 S.W.3d 600, 602 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The TCPA defines "legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6). The trial court may extend the time to file a motion to dismiss "on a showing of good cause."[7] *Id.* § 27.003(b); *Grant*, 556 S.W.3d at 885; *Jordan*, 510 S.W.3d at 197.

---

[7] The TCPA does not define "good cause." In other contexts, including determining whether good cause exists to allow the withdrawal of deemed admissions and to allow the late-filing of a summary judgment response, the Texas Supreme Court has held that good cause is "established by showing the failure involved was an accident or mistake, not intentional or the result of conscious indifference." *See Wheeler v. Green*, 157 S.W.3d 439, 442 (Tex. 2005) (per curiam) (withdrawal of deemed admissions); *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 688 (Tex. 2002) (late-filing of summary judgment response).

Here, Youngblood originally filed suit against the Kuboshes for violation of the civil barratry statute in Jefferson County on April 5, 2013. Carter filed suit against the Kuboshes in Harris County on August 28, 2013, and Nash filed suit against the Kuboshes in Jefferson County on October 1, 2014. Although the plaintiffs have amended their petition several times during the course of this litigation, the only cause of action they have ever asserted against the Kuboshes is a claim for violation of the civil barratry statute. The Kuboshes did not file their TCPA motion to dismiss the civil barratry claims against them until March 29, 2018, nearly five years after Youngblood first filed suit.

The Kuboshes acknowledge that their TCPA motion to dismiss was not filed within sixty days after the date of service of the legal action against, and, thus, that their motion to dismiss was untimely. They argue, however, that "good cause" exists for their late filing of the motion to dismiss and that the trial court erred by denying their motion on this basis. Specifically, the Kuboshes argue that

> It was only well after the deadline to file a TCPA motion to dismiss that the true factual background emerged in this case, and that the "commercial speech" exception could be seen not to apply, that discovery revealed that the evidence showed that, in fact, the Sullo Plaintiffs [e.g., Youngblood, Carter, Nash] were acting on behalf of Andrew Sullo and could not be actual or potential customers of the Kuboshes in connection with the communications at issue.

The Kuboshes contend that, due to the actions of Andrew Sullo and Zimmerman, they were unable to determine the true nature of the case against them, justifying the late filing of their TCPA motion. We disagree.

The record reflects that on October 21, 2014, approximately three weeks after Nash filed the third and last suit against the Kuboshes, the Kuboshes filed their second amended answer and counterpetition in the Carter suit. This pleading contains the Kuboshes' first allegations that the plaintiffs' calls to their office were made for an improper purpose. Specifically, the Kuboshes alleged:

> [Andrew] Sullo orchestrated each and every *Carter* Plaintiff's and another 64 barratrously-solicited strangers' calls from Sullo's own [Sullo & Sullo] office (as well as other locations) to Kubosh Bonding using phone numbers Sullo provided each *Carter* Plaintiff, along with pretextual "price match" scripts, and previously-prepared form affidavit instructions listing Kubosh Law as the intended ultimate recipient of each Sullo-instructed call.
>
> Sullo masterminded an attorney-crafted scheme to perpetrate a Fraud on the Court, defined in BLACK'S LAW DICTIONARY and case law as "a lawyer's or party's misconduct so serious that it undermines or is intended to undermine the integrity of the proceeding" such as "bribery of a juror and introduction of fabricated evidence." Sullo surreptitiously recorded every *Carter* Plaintiff's call. Sullo then filed this suit to retaliate against the Kubosh Brothers . . . .
>
> . . . .
>
> This case does not involve barratry by Kubosh Bonding or Kubosh Law but, instead, a Fraud on the Court orchestrated by Sullo and [Sullo & Sullo] using each *Carter*, *Youngblood and Nash* Plaintiff, 64 people who called the Kubosh Brothers but remain "plaintiffs-in-waiting," aided and abetted by Zimmerman and Zimmerman Axelrad. This Court

should bring an end to the first phase of this lawsuit by dismissing, with prejudice, the *Carter* Plaintiffs' Fraud on the Court claims.

The Kuboshes then, in that same pleading, raised an as-applied challenge to the constitutionality of the civil barratry statute and asserted claims against the Carter parties, Andrew Sullo, and Sullo & Sullo, including claims for common-law fraud, civil conspiracy, RICO violations, and conspiracy to violate RICO.

On January 22, 2016, in the Nash case, the Kuboshes filed a combined motion to transfer venue, amended answer, original counterclaim against Nash, and original third-party claims against Andrew Sullo, Gregory Sullo, and Sullo & Sullo, LLP. The Kuboshes alleged that, as of that time, "[t]he precise involvement of Zimmerman and Fisher in planning and executing the calls is not yet completely known," but due to a privilege log, the Kuboshes were aware that Andrew "Sullo and Zimmerman were in email communication as early as January 27, 2012 'concerning status of barratry litigation'—a little over two months following the first and most significant spate of calls made from Sullo's office to the Kubosh Defendants." The Kuboshes also alleged, "This scenario is overwhelming evidence of obstruction of justice. . . . The [Carter parties] are relevant to this case only as a tool for the criminal enterprise of Third-Party Defendants [Andrew Sullo, Gregory Sullo, and Sullo & Sullo] and their confederates, Brian Zimmerman and Joe Fisher." The Kuboshes again challenged the constitutionality of the civil barratry statute and asserted claims against the Carter parties, Andrew Sullo, Gregory Sullo, and Sullo

& Sullo, including claims for common-law fraud, civil conspiracy, RICO violations, conspiracy to violate RICO, and violations of federal and state wiretapping statutes. The Kuboshes alleged that the Carter parties and the "Sullo Parties" "formed a RICO association-in-fact enterprise with common and continuing purposes, namely, to serve as a flexible vehicle to set up and file these *in terrorem* lawsuits based upon created facts . . . ."

The record also reflects that while the Carter parties and Andrew Sullo have moved for summary judgment on the Kuboshes' counterclaims—and received a favorable summary judgment ruling on the Kuboshes' common-law fraud claims— the Kuboshes also moved for summary judgment on the Carter parties' claims in September 2015 and again in August 2017. The Kuboshes, however, did not seek dismissal of the Carter parties' claims against them under the TCPA until March 2018, nearly five years after the filing of Youngblood's lawsuit. By the time the Kuboshes moved for dismissal under the TCPA, they had been asserting that the Carter parties' lawsuits were a "fraud on the court" and should be dismissed due to Andrew Sullo's improper conduct "orchestrating" the cases since October 2014, nearly three-and-a-half years before they filed their TCPA motion.

One of the overarching purposes of the TCPA is to provide an expedited dismissal procedure for lawsuits that are based on, related to, or in response to the exercise of certain statutorily-protected rights. *See, e.g.*, *In re Lipsky*, 460 S.W.3d at

586 ("The Act provides a special procedure for the *expedited dismissal* of such suits [that fall within the TCPA's purview].") (emphasis added); *Jordan*, 510 S.W.3d at 198 (noting that it is "well settled" that purpose of TCPA is to allow defendant "early in the lawsuit" to seek dismissal of claims that implicate certain protected rights). Allowing consideration of the Kuboshes' TCPA motion in this case, filed years after they were served with a legal action setting out the only causes of action that have been asserted against them and filed after the Kuboshes have filed dispositive summary judgment motions on those causes of action, would frustrate the purpose of the TCPA and its expedited procedures. We conclude that the Kuboshes did not establish good cause for the late filing of their TCPA motion to dismiss. We therefore hold that the trial court did not err by denying the Kuboshes' TCPA motion.[8]

---

[8] The parties disagree regarding the appropriate standard of review for this issue. The Kuboshes argue that we should review this question de novo, pointing out that appellate courts review trial court rulings granting or denying TCPA motions to dismiss, as well as questions of statutory construction of the TCPA, de novo. *See Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 83 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The Carter parties argue that we should review this issue for an abuse of discretion, pointing out that section 27.003(b) provides that the trial court "*may* extend the time to file a motion under this section on a showing of good cause" and that, in other contexts, courts generally review determinations of good cause for an abuse of discretion. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b) (emphasis added); *see, e.g.*, *Carpenter*, 98 S.W.3d at 686 (reviewing trial court's ruling on motion for leave to file late summary judgment response for abuse of discretion). We need not determine which standard of review is appropriate for reviewing the question of whether a trial court properly determined that good cause did or did not exist for the late filing of a TCPA motion because, under the facts of this case, even under the less-deferential de novo standard of review, the Kuboshes have not established that good cause existed for them to file their TCPA motion nearly five years after the filing of the first suit asserted against them.

We overrule the Kuboshes' sole issue, and we hold that the trial court did not err in denying the Kuboshes' motion to dismiss the Carter parties' barratry suits against them.

## Conclusion

We affirm the trial court's order denying Sullo's, Zimmerman's, and the Kuboshes' motions to dismiss under the TCPA.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Kelly, and Landau.